**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Thomas L. HUDSPETH, Defendant–Appellant.**

**No. 93–1352.**

United States Court of Appeals, Seventh Circuit.

Argued En Banc June 10, 1994.

Decided Oct. 28, 1994.*

---

* The opinion was originally released in typescript.

See also, 42 F.3d 1013.

Byron G. Cudmore, Asst. U.S. Atty., Rodger Heaton (argued), Office of the United States Attorney, Springfield, IL, for plaintiff-appellee.

Samuel J. Cahnman, Springfield, IL, (argued), for defendant-appellant.

Before POSNER, Chief Judge, FAIRCHILD,** CUMMINGS, BAUER, COFFEY, FLAUM, EASTERBROOK, RIPPLE, MANION, KANNE and ROVNER, Circuit Judges.***

---

** Judge Fairchild is participating in this *en banc* decision because he was a member of the three-judge panel which heard this case. *See Allen v. Johnson,* 391 F.2d 527 (5th Cir.1968) (*en banc*).

*** When this case was orally argued and considered by the court on June 4, 1994, Judge Cudahy was in regular active service. He participated in both the oral argument and the *en banc* conference. He subsequently approved Judge Ripple's opinion, then believed to be the prospective majority opinion, and filed a special concurrence supporting reversal of the judgment of the district court. On August 15, 1994, Judge Cudahy attained senior status. He has read *United States v. American–Foreign S.S. Corp.,* 363 U.S. 685, 80 S.Ct. 1336, 4 L.Ed.2d 1491 (1960), interpreting 28 U.S.C. § 371(b), as disqualifying him from further participation in this case because he had become a senior judge. *See Latin American Citizens Council v. Clements,* 914 F.2d 620, 622 n. * (5th Cir.1990) (en banc)· (statement of Judge Reavley); *United States v. Anderson,* 885 F.2d

COFFEY, Circuit Judge.

Thomas L. Hudspeth pled guilty to one count of unlawful possession of a firearm by a convicted felon. *See* 18 U.S.C. § 922(g)(1). The sentencing judge found that Hudspeth qualified for an enhancement of his sentence under the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e)(1), based on his criminal record. The ACCA mandates a sentence of not less than fifteen years for a defendant with three prior convictions for violent felonies who is subsequently convicted for the unlawful possession of a firearm. The court imposed a fifteen year sentence, which Hudspeth appeals on two grounds: first, that he was improperly sentenced as an "armed career criminal" under the ACCA, and second, that the district court's recalculation of his sentence violated the Double Jeopardy Clause. We affirm.

## I.

## BACKGROUND

■ On August 1, 1991, Hudspeth pled guilty to one count of unlawful possession of a firearm by a convicted felon.[1] Prior to Hudspeth's plea, the government advised him that it intended to seek the minimum fifteen year sentence enhancement[2] authorized by the ACCA, 18 U.S.C. § 924(e)(1), which states:

> "In the case of a person who violates section 922(g) of this title and has three previous convictions by any court ... for a violent felony or a serious drug offense, or both, committed on occasions different from one another, such person shall be fined not more than $25,000 and imprisoned not less than fifteen years."

Hudspeth had three prior burglary convictions for crimes committed in Sangamon County, Illinois. The district court reviewed the police reports from Hudspeth's three prior burglaries,[3] which described the following facts concerning Hudspeth's 1983 state burglary convictions.[4] On March 27, 1983, at about 7:15 p.m., Hudspeth and two others were observed at the Laketown Shopping Center, a strip mall in Springfield, Illinois. Hudspeth was carrying a large canvas bag, which was later discovered to contain a sledge hammer, pry bars, chisels, a screwdriver, a pipe wrench, two police scanners, and a CB radio. In approximately thirty-five minutes, the three men broke into and ransacked a doughnut shop, a dry cleaners, and

1248, 1249 n. * (5th Cir.1989) (en banc) (statement of Judge Rubin). This view has now been confirmed by an opinion of this court, and Judge Cudahy has withdrawn his prior vote and special concurrence and is no longer a participant in this case.

1. It is a federal crime for any person "who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year; ... to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition." 18 U.S.C. § 922(g)(1).

2. The penalty for violation of 18 U.S.C. § 922(g) in the absence of three prior violent felony convictions is imprisonment for not more than ten years. *See* 18 U.S.C. § 924(a)(2).

3. In *Taylor v. United States,* 495 U.S. 575, 600–01, 110 S.Ct. 2143, 2159–60, 109 L.Ed.2d 607 (1990), the Supreme Court limited sentencing courts in deciding whether an offense is a "violent felony" under the ACCA, to looking only at the statutory definition of the prior offense and not to the particular facts underlying the conviction. However, *Taylor* does not preclude a sentencing court from examining the factual underpinnings of a defendant's prior convictions in

order that it might properly apply the ACCA and determine if multiple offenses occurred on one or more "occasions." As a practical matter, a district court frequently must look beyond charging papers and judgment of conviction for these documents alone rarely provide the district court with the detailed information necessary (*i.e.,* time, victim, location) to determine whether multiple offenses occurred on one or more "occasions." A district court's examination of the factual basis for a defendant's prior convictions does not amount to a retrial of those crimes as prohibited in *Custis v. United States,* —— U.S. ——, 114 S.Ct. 1732, 128 L.Ed.2d 517 (1994). The sentencing court is not being called upon to second-guess valid state court convictions, rather, it is merely determining whether the three valid convictions resulted from one occasion or more than one occasion. Thus, the district court and this court have examined the police reports to accurately determine the facts of the three burglaries.

4. Federal courts must give credence to state court convictions. *See Custis,* —— U.S. at ——, 114 S.Ct. at 1736 ("prior convictions used for sentence enhancement purposes under § 924(e) are not subject to collateral attack in the sentence proceeding").

an insurance company. The burglars were apprehended during their attempt to enter a fourth business.[5]

The district court found that Hudspeth's three 1983 convictions for burglary were three "separate crimes against separate victims in separate locations." Thus the court concluded that Hudspeth's burglaries were crimes "committed on occasions different from one another" and thus qualified Hudspeth for the minimum fifteen year sentence enhancement set by § 924(e)(1).

## II.

## DISCUSSION

A. *Sentence Enhancement Under the Armed Career Criminal Act*

1. *Crimes "Committed on Occasions Different From One Another"*

■ Under the ACCA, a thrice convicted felon, who is subsequently convicted for the unlawful possession of a firearm, is subject to a mandatory sentence of not less than fifteen years provided that the three prior convictions resulted from acts "*committed on occasions different from one another....*" 18 U.S.C. § 924(e)(1).[6] This Circuit and other Circuits have had numerous opportunities to interpret the phrase "*committed on occasions different from one another*" in situations like the present case where several crimes were committed in rapid succession. This Circuit has joined nine other Circuits, including the First, Second, Third, Fifth, Sixth, Eighth, Ninth, Tenth and Eleventh, in holding that a defendant is subject to the sentence enhancement if each of the prior convictions arose out of a "*separate and distinct criminal episode.*" *United States v. Schieman,* 894 F.2d 909, 911 (7th Cir.), *cert. denied,* 498 U.S. 856, 111 S.Ct. 155, 112

L.Ed.2d 121 (1990) (emphasis added); *see United States v. Pedigo,* 879 F.2d 1315 (6th Cir.1989); *United States v. Towne,* 870 F.2d 880 (2d Cir.), *cert. denied,* 490 U.S. 1101, 109 S.Ct. 2456, 104 L.Ed.2d 1010 (1989); *United States v. Schoolcraft,* 879 F.2d 64, 74 (3d Cir.), *cert. denied,* 493 U.S. 995, 110 S.Ct. 546, 107 L.Ed.2d 543 (1989); *United States v. Herbert,* 860 F.2d 620 (5th Cir.1988), *cert. denied,* 490 U.S. 1070, 109 S.Ct. 2074, 104 L.Ed.2d 639 (1989); *United States v. Gillies,* 851 F.2d 492 (1st Cir.), *cert. denied,* 488 U.S. 857, 109 S.Ct. 147, 102 L.Ed.2d 119 (1988); *United States v. Rush,* 840 F.2d 580 (8th Cir.1988); *United States v. Antonie,* 953 F.2d 496, 498–99 (9th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 138, 121 L.Ed.2d 91 (1992); *United States v. Green,* 967 F.2d 459, 462 (10th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 435, 121 L.Ed.2d 355 (1992); *United States v. Greene,* 810 F.2d 999 (11th Cir. 1986).

■ This Circuit, when considering whether multiple convictions arose out of "separate and distinct criminal episodes," has consistently looked to the nature of the crimes, the identities of the victims, and the locations. In *Schieman,* the defendant committed a burglary; three blocks away and ten minutes later he attacked and injured a police officer. *Schieman,* 894 F.2d at 913. Judge Bauer, writing for the court, ruled that Schieman's actions constituted two separate "occasions" under the ACCA because he "'committed *separate crimes* against *separate victims* in *separate locations.*'" *Id.* (quoting *Towne,* 870 F.2d at 881 (emphasis added).

We followed the same reasoning in *United States v. Godinez,* 998 F.2d 471 (7th Cir. 1993). In *Godinez,* the defendant kidnapped a woman at 8:45 p.m. in order that he might use her car in a robbery. He took the victim

---

**5.** Hudspeth was arrested in the doughnut shop.

**6.** According to *United States v. Gallman,* 907 F.2d 639, 643 (7th Cir.1990), *cert. denied,* 499 U.S. 908, 111 S.Ct. 1110, 113 L.Ed.2d 219 (1991) and *United States v. Redding,* 16 F.3d 298, 302 (8th Cir.1994), under § 924(e)(1), the government must establish that a defendant has three prior violent felony convictions. A certified record of conviction or a presentence investigation report, if not challenged, will normally satisfy

this showing. *Redding,* 16 F.3d at 302; *United States v. Ruo,* 943 F.2d 1274, 1276 (11th Cir. 1991). The burden then shifts to the defendant to establish by a preponderance of the evidence that the prior convictions occurred on a single "occasion," and thus cannot be the basis for sentence enhancement under § 924(e)(1). *See Redding,* 16 F.3d at 302 (defendant bears the burden of proving that prior convictions cannot be used for sentence enhancement).

to his apartment where an accomplice kept watch over her. The defendant then drove the victim's car to a convenience store where he committed the robbery at 10:00 p.m. He was arrested on the way back to his apartment. *Id.* at 472. In *Godinez* we held that even though the defendant admitted that he kidnapped the woman in order to use her car in the robbery, the kidnapping and robbery were two separate criminal aggressions against separate victims. *Id.* at 472–73.

In *Godinez,* we distinguished *Schieman* from *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), in which the defendant (Ashe) committed *multiple offenses* on a *single occasion (in the same location and at the same time)* by "robb[ing] six players at a poker game, committing at least six [simultaneous] crimes with the same [command of] 'stick 'em up'." *Godinez,* 998 F.2d at 472. Judge Easterbrook explained that

"[o]rdering six poker players at the same game to empty their pockets is one criminal episode. *But one crime hard on the heels of another can be a 'separate and distinct criminal episode',* as *Schieman* itself shows. Schieman committed a burglary. Three blocks away he attacked and wounded a police officer. This was a distinct transaction, we held, because the burglary was over. . . . Schieman could have committed either crime without the other; a person willing to commit both is more dangerous than a person who confines himself to one. *That the two crimes were close in time did not matter, we concluded."*

*Id.* (emphasis added) (citations omitted). *Godinez* concluded that "the question is not whether one crime overlaps another but whether the crimes reflect *distinct aggressions."* *Id.* at 473 (emphasis added); *see also United States v. Washington,* 898 F.2d 439, 441–42 (5th Cir.), *cert. denied,* 498 U.S. 842, 111 S.Ct. 122, 112 L.Ed.2d 91 (1990) (successive robberies of the same store clerk at the same convenience store by the same defendant within two hours held to be separate criminal episodes); *Antonie,* 953 F.2d at 499 (two armed robberies committed on the same evening approximately forty minutes

apart held to be two separate predicate offenses).

In *United States v. Tisdale,* 921 F.2d 1095 (10th Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 596, 116 L.Ed.2d 619 (1991), a case factually indistinguishable from the one before us, the Tenth Circuit held that a burglar who broke into three stores in a mall had committed the crimes on three separate "occasions" under the ACCA:

"After the defendant 'successfully completed' burglarizing one business, he was free to leave. The fact that he chose, instead, to burglarize another business is evidence of his intent to engage in a separate criminal episode. Moreover, unlike [*United States v. Petty,* 798 F.2d 1157 (8th Cir. 1986), *vacated,* 481 U.S. 1034, [107 S.Ct. 1968, 95 L.Ed.2d 810], *on remand,* 828 F.2d 2 (8th Cir.1987) ], the defendant's burglaries did not occur at the same location. *The record shows that although defendant entered one shopping mall he had to physically break [into] and enter three separate structures.* The fact each incident occurred inside one enclosed structure does not alter our conclusion that the crimes were committed at different locations. Thus we find that the trial court properly enhanced the defendant's penalty under § 924(e)(1)."

*Id.* at 1099 (emphasis added).

■ Cases interpreting the ACCA clearly uphold the minimum fifteen-year sentence enhancement for criminals who commit separate crimes against different individuals while on a spree, within a short period of time, provided that the perpetrator had the opportunity to cease and desist from his criminal actions at any time. For instance, in *United States v. Brady,* 988 F.2d 664, 668–669 (6th Cir.) *(en banc), cert. denied,* —— U.S. ——, 114 S.Ct. 166, 126 L.Ed.2d 126 (1993), the Sixth Circuit held that two armed robberies committed against different victims at different locations within the span of forty-five minutes were separate criminal episodes. The court in *Brady* defined a criminal episode as "an incident that is part of a series, but forms a separate unit within the whole. Although related to the entire course of events, an episode is a punctuated occurrence

with a limited duration." *Id.* (citing *United States v. Hughes,* 924 F.2d 1354, 1361 (6th Cir.1991)). Under the ACCA, the relevant inquiry as to the timing of multiple crimes is simple: were the crimes *simultaneous* or were they *sequential?*

■ Hudspeth's criminal history clearly makes him a proper subject for the sentence enhancement provision of the ACCA.[7] Hudspeth committed three distinct burglaries against three separate victims (the owners of three distinct business enterprises), in three separate locations[8] over the course of more than thirty minutes[9]—a greater period of time than the two crimes committed in *Schieman* (ten minutes). Hudspeth's three burglaries were *sequential* (committed in succession), and not *simultaneous;* it is physically impossible for one person to commit three burglaries simultaneously at three different locations. Because Hudspeth's crimes were committed sequentially, against different victims, at different times, and at different locations, they were clearly crimes "committed on occasions different from one another" as required under the ACCA. *See Tisdale,* 921 F:2d at 1099.

■ The ACCA is directed at criminals who make a career out of criminal activity. A defendant who has the opportunity to cease and desist or withdraw from his criminal activity at any time, but who chooses to commit additional crimes, deserves harsher punishment than the criminal who commits multiple crimes simultaneously. An individual who commits simultaneous crimes (one single criminal action directed against a number of individuals), as did the defendant in *Petty,* has no opportunity to turn back and abandon his criminal conduct—the crime is completed with the single utterance of "stick 'em up." *See Godinez,* 998 F.2d at 472. The same is true of an individual who violates multiple criminal statutes by a single act.[10] In contrast, a defendant who commits sequential crimes has the opportunity at each and every turn to withdraw from his criminal activity.

7. While we realize that the issue in this appeal is whether the three burglaries occurred on one "occasion" or more than one "occasion," it is interesting to note that these three burglaries are not the only offenses for which Hudspeth has been convicted. The Presentence Report reveals that as a juvenile in 1975, Hudspeth was adjudicated delinquent on two counts of burglary, one count of theft and one count of using an intoxicant. In 1979 as an adult, Hudspeth pled guilty to one count of theft and was sentenced to 60 days in jail and 30 months probation. In 1980, while on probation from the 1979 conviction, he was charged with and pled guilty to one count of burglary and was sentenced to four years of incarceration. In 1982, Hudspeth pled guilty to one count of trespassing and one count of resisting arrest. He was fined $250. Later in 1982, he was charged with and pled guilty to another count of resisting a peace officer and was sentenced to 30 days in jail. In 1983, Hudspeth pled guilty to the three burglaries of the strip mall and was sentenced to four years of confinement. Finally, in 1986, he was sentenced to two years of incarceration after pleading guilty to two counts of unlawful use of a firearm by a felon.

It is quite evident that Hudspeth is precisely the type of career criminal at whom the ACCA is directed. Nonetheless, the mandatory fifteen-year minimum sentence applies only if Hudspeth's three burglaries in 1983 are determined to have been "committed on occasions different from one another" because, other than his 1980 burglary conviction, his other prior offense was an adjudication of juvenile delinquency, which does not count under the ACCA unless it involved a violent felony. *See* 18 U.S.C. § 924(e)(2)(C).

8. The three burglaries on March 27, 1983, occurred at three separate addresses: Farmers Insurance Company was at 1810 Stevenson Drive, Melo Creme Doughnut was located at 1814 Stevenson Drive, and Homestyle Cleaners was at 1816 Stevenson Drive. Presumably each business owner paid separate rent and taxes and filed separate insurance claims for the damage Hudspeth caused. *See Tisdale,* 921 F.2d at 1099 ("[t]he fact each incident occurred inside one enclosed structure [a mall] does not alter our conclusion that the crimes were committed at *different locations* ") (emphasis added).

9. The police reports reveal that Hudspeth and his two accomplices entered the first business establishment at approximately 7:20 p.m. and the police officers apprehended the burglars at approximately 7:55 p.m. while they were in the process of burglarizing a fourth business.

10. For instance a single drug sale may result in a multiple count indictment charging a defendant with (1) conspiracy to possess with intent to distribute narcotics (21 U.S.C. § 846); (2) possession with intent to distribute narcotics (21 U.S.C. § 841); (3) possession of a firearm during commission of a drug offense (18 U.S.C. § 924(c)(1)); (4) sale of narcotics within 1000 feet of a school (21 U.S.C. § 860); and (5) involving a person under 18 years of age in a drug transaction (21 U.S.C. § 861).

Hudspeth, a professional burglar, came to the Laketown Shopping Center armed for each and every eventuality that might arise. Hudspeth was observed carrying a bag, later found to contain a sledge hammer, pry bars, chisels, a screwdriver, a pipe wrench, two police scanners, and a CB radio. Obviously he had cased the premises in advance for he knew precisely which tools were necessary to break into the individual business locations. The record implies that the burglars first unlawfully pried open the rear door of the dry cleaners.[11] At that point, the three men could have terminated their criminal endeavor, but they chose instead to commit a second burglary. The burglars then used a sledge hammer to bust a hole through the shared wall between the dry cleaners and the doughnut shop. Once again, Hudspeth could have aborted the criminal activity, but he decided instead to commit a third burglary. One of the burglars then forced open the door connecting the doughnut shop and the insurance company. Following this entry, the burglars attempted to enter a fourth business, but they were apprehended during their attempt.

Entry into each successive business reflected a clear and deliberate choice to commit a "distinct aggression," *Godinez*, 998 F.2d at 473. At any given point in time during his crime spree, Hudspeth was free to cease and desist from further criminal activity. He instead chose to continue. Because of his three decisions to enter each successive business, it is evident that he intended "to engage in a separate criminal episode." *Tisdale*, 921 F.2d at 1099; *see also Godinez* 998 F.2d at 472 ("one crime hard on the heels of another can be a 'separate and distinct criminal episode', as *Schieman* itself shows").[12]

### 2. The Legislative History of § 924(e)(1)

■ As an initial matter, we must state our disagreement with the use of legislative history to interpret unambiguous statutory language. As a court of appeal, we may turn to the legislative history to interpret a statute only when the statute is *ambiguous*. *United States v. Shriver*, 989 F.2d 898, 901 (7th Cir.1992); *see also United States v. Real Estate Known as 916 Douglas Ave.*, 903 F.2d 490, 492 (7th Cir.1990) ("we will look beyond the express language of a statute only where that statutory language is ambiguous or where a literal interpretation would lead to an absurd result or thwart the purpose of the overall statutory scheme").[13] We are of the

11. The police reports do not establish with any certainty the sequence of the burglaries or the precise means of entry. However, for the purposes of this appeal, the order of and methods used to effect each entry are immaterial; regardless of order, the second and third burglaries were committed sequentially to one another.

12. Chief Judge Posner asked at oral argument whether the court should impose different sentences for the burglar who breaks into three houses that are separated by six inches of airspace and the burglar who breaks into three row houses that share a wall. Clearly, enhancing the sentence of one of these burglars and not the other would lead to an absurd result. The true inquiry is whether the crimes were committed in succession to one another. A defendant who commits three crimes sequentially will have made three distinct and deliberate choices to commit a crime. Hudspeth clearly committed three sequential crimes against three separate victims in three separate locations.

Judge Bauer presented another hypothetical at oral argument to clarify the *Schieman* standard. He inquired of the Assistant U.S. Attorney ("AUSA") if a gunman entered a room and murdered seven people in the room whether that was one occasion or seven occasions. The AUSA, relying on *United States v. Petty*, 828 F.2d 2 (8th Cir.1987), responded that it would probably be one occasion. Judge Bauer inquired further if the gunman entered seven different rooms and murdered one person in each room whether that constituted one occasion or seven occasions for purposes of the ACCA. The AUSA argued that situation constituted seven occasions because the intervening time as the gunman marched from room to room permitted him to determine whether to cease or continue with his murderous spree.

13. Resort to legislative history is usually selective and thus of little value if any when interpreting a statute. *See Holder v. Hall* —— U.S. ——, ——, 114 S.Ct. 2581, 2612, 129 L.Ed.2d 687 (1994) (legislative history "is read selectively to support the result the Court intends to achieve") (Thomas, J., concurring); *see also Conroy v. Aniskoff*, —— U.S. ——, ——, 113 S.Ct. 1562, 1567, 123 L.Ed.2d 229 (1993) ("The greatest defect of legislative history is its illegitimacy. We are governed by laws, not by the intentions of legislators. . . . If one were to search for an interpretive technique that, on the whole, was more likely to confuse than to clarify, one could hardly find a more promising candidate than legislative history.") (Scalia, J., concurring in the judgment) (emphasis added).

opinion that the phrase "committed on occasions different from one another" is unambiguous.[14] Other members of this court, however, believe the phrase "committed on occasions different from one another" is ambiguous, and have looked to the legislative history for guidance. For this reason, a brief review of the legislative history becomes necessary.

In 1988, Senator Joseph Biden proposed amending § 924(e)(1) of the ACCA to require sentence enhancement for multiple convictions only when those convictions resulted from crimes "committed on occasions different from one another." This new language was proposed after the Eighth Circuit's original decision in *Petty*, in which the court held that the ACCA's fifteen year minimum sentence could be imposed on a defendant with six prior convictions for armed robbery stemming from an incident in which the defendant robbed six different people in a restaurant simultaneously. *United States v. Petty*, 798 F.2d 1157, 1159–60 (8th Cir.1986), *vacated*, 481 U.S. 1034, 107 S.Ct. 1968, 95 L.Ed.2d 810 (1987).[15] Although neither the statute nor the legislative history defines exactly what Congress meant by "occasions different from one another,"[16] the legislative history does more than merely imply that Congress intended only to preclude the classification of *simultaneous* offenses as separate offenses for the purposes of sentence enhancement under the ACCA. Senator Biden explained that the amendment would serve to punish career offenders, even for multiple offenses committed on the same night, so long as the crimes are not simultaneous in nature.

> "Under the amendment, the three previous convictions would have to be for offenses 'committed [on] occasions different from one another.' Thus a single multicount conviction could still qualify where the counts related to crimes committed on different occasions, but a robbery of multiple victims simultaneously (as in Petty) would count as only one conviction."

134 Cong.Rec. S17,370 (daily ed. Nov. 10, 1988) (remarks of Sen. Biden). Congress added the phrase "committed on occasions different from one another" to address situations similar to *Petty*, where a defendant's single action results in the commission of multiple, simultaneous crimes. The amendment would also preclude the separate consideration of multiple convictions arising from a single criminal act that violates several different criminal statutes. *See supra* n. 10. Neither of these situations is presented by the case before us.

As made clear earlier in this opinion, Hudspeth did not commit three simultaneous crimes against multiple victims as the defendant did in *Petty* where, at one time, with one single command, and in one location, Petty robbed six people. Nor did Hudspeth violate several statutes with a single criminal act. Hudspeth committed three separate crimes, at three separate times, against three separate victims, in three separate locations. Under the plain language of § 924(e)(1) as

---

14. A number of circuit courts have held that the language of § 924(e)(1) is unambiguous in that a defendant's *conviction* for one predicate offense need not precede the *commission* of the next predicate offense to trigger sentence enhancement under the ACCA. *See United States v. Anderson*, 921 F.2d 335, 339–40 (1st Cir.1990) ("we view the plain language of the statute ... as dispositive"); *United States v. Mason*, 954 F.2d 219, 221–22 (4th Cir.1991) ("[w]e do not agree that the statute is ambiguous"), *cert. denied*, —— U.S. ——, 112 S.Ct. 1979, 118 L.Ed.2d 578 (1992); *United States v. Mitchell*, 932 F.2d 1027, 1028 (2d Cir.1991) (*per curiam*) ("this language unambiguously requires that a defendant's three convictions stem from three, separate criminal episodes ... [and] does not require that a defendant's three criminal acts be punctuated by intervening convictions").

15. The Eighth Circuit subsequently reconsidered its decision in *Petty*, and concluded that Petty's six convictions for robbery occurred on a single "occasion" under the ACCA. *United States v. Petty*, 828 F.2d 2, 3 (8th Cir.1987), *cert. denied*, 486 U.S. 1057, 108 S.Ct. 2827, 100 L.Ed.2d 928 (1988).

16. The plain meaning of the term "occasion" incorporates a temporal distinction, *i.e.*, one occasion cannot be simultaneous with another occasion. Black's Law Dictionary defines an occasion as a "particular time." Webster's Third New International Dictionary defines an occasion as "a particular time at which something takes place: a time marked by some happening." *See also Tisdale*, 921 F.2d at 1099 ("[a] plain reading of the statutory language of § 924(e)(1), 'occasions different from one another', supports the conclusion that Congress intended the three predicate offenses to be distinct in time").

well as the legislative history, Hudspeth committed his crimes on three "occasions different from one another."

## B. *Double Jeopardy*

The Double Jeopardy Clause states that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const., amend. V. The Clause prohibits multiple punishments for the same offense. *Ohio v. Johnson*, 467 U.S. 493, 498, 104 S.Ct. 2536, 2540, 81 L.Ed.2d 425 (1984). A sentencing court may not sentence a defendant to multiple punishments for the same offense in excess of the total punishment authorized by the legislature. *United States v. Halper*, 490 U.S. 435, 450–51, 109 S.Ct. 1892, 1902–03, 104 L.Ed.2d 487 (1989).

In an unpublished order, a panel of this court initially vacated Hudspeth's original sentence and remanded the case to the district court, with instructions to "hold a hearing, enter findings of fact, and determine whether a proper basis exists for applying the § 924(e) enhancement." *United States v. Hudspeth*, No. 91–3786, 1992 WL 205666, at *2, 1992 U.S.App. LEXIS 20581, at *5 (7th Cir. Aug. 20, 1992). The district court had based Hudspeth's original sentence on Hudspeth's 1975 adjudication of juvenile delinquency for burglary, 1980 conviction for burglary, and 1983 convictions for three burglaries. On remand, the government abandoned its reliance on Hudspeth's juvenile burglary, and focused on his three 1983 state convictions for burglary. After the resentencing hearing, the district court concluded that Hudspeth had committed three prior burglaries "on occasions different from one another" and imposed the fifteen year minimum sentence required by the ACCA.

Hudspeth argues that the district court's recalculation of his sentence after his resentencing hearing placed him in jeopardy twice for the same offense.[17] He argues that the government improperly premised its request for an enhanced sentence on a version of Hudspeth's criminal conviction history different than the version presented at the original sentencing hearing. This argument does not justify reversal.

Hudspeth's argument is based on the government's reliance at resentencing on Hudspeth's three 1983 burglaries. Hudspeth contends that the Double Jeopardy Clause prohibits the approach the government took here—initially premising its request for sentence enhancement on one version of Hudspeth's criminal conviction history and, at resentencing, premising its request for sentence enhancement on a second version.

Sentencing matters do not ordinarily have the "qualities of constitutional finality that attend an acquittal." *United States v. DiFrancesco*, 449 U.S. 117, 134, 101 S.Ct. 426, 436, 66 L.Ed.2d 328 (1980). As a result, recidivist statutes that impose enhanced sentences on repeat offenders generally do not violate the Double Jeopardy Clause. *See, e.g., Denton v. Duckworth*, 873 F.2d 144, 147 (7th Cir.), *cert. denied*, 493 U.S. 941, 110 S.Ct. 341, 107 L.Ed.2d 330 (1989) (holding that the Double Jeopardy Clause was not violated by an Indiana recidivist statute that did not impose additional punishment for a past crime, but rather imposed additional punishment for the later crime). The same reasoning upholds the constitutionality of sentence enhancement under the United States Sentencing Guidelines. *See, e.g., United States v. Duarte*, 28 F.3d 47 (7th Cir.1994) (sentence enhancement for obstruction of justice under U.S.S.G. § 3C1.1 did not raise double jeopardy concerns); *United States v. Shaw*, 26 F.3d 700 (7th Cir.1994) ("[A] sentence enhanced by reference to a

---

17. Hudspeth also argues that the government violated his right to due process in that he received inadequate notice of the offenses on which his enhanced sentence was based. The Supreme Court has held that a defendant must "receive reasonable notice and an opportunity to be heard relative to [any] recidivist charge." *Oyler v. Boles*, 368 U.S. 448, 452, 82 S.Ct. 501, 504, 7 L.Ed.2d 446 (1962). Hudspeth's contention that the notice he received was not "reasonable" is unsupported by the record. The Information Charging Prior Offenses, which was filed eighteen days after the return of the indictment and twenty-three days before Hudspeth signed the plea agreement, gave Hudspeth adequate notice of the prior convictions on which the government based its request for an enhanced sentence. Hudspeth's argument that he received inadequate notice is altogether without merit.

prior conviction is not a 'second punishment for the first crime.' It is a punishment for the new crime, tailored to the offender's circumstances in light of knowledge that higher penalties are needed to deter persons who have not responded to lesser sanctions").

■ Sentence enhancement for "career criminals" under the ACCA implicates no greater double jeopardy concerns than sentence enhancement under other recidivist statutes or the United States Sentencing Guidelines. Enhanced sentences based on valid prior convictions that are within the appropriate sentencing range, as were both of Hudspeth's sentences, result in no double jeopardy violations.

■ The government's change in tactics at Hudspeth's resentencing hearing, from reliance on Hudspeth's 1975, 1980 and 1983 offenses to reliance on only the 1983 convictions, does not alter our conclusion. The Double Jeopardy Clause bars retrial of a defendant when the defendant's conviction is reversed because the government's evidence was insufficient to sustain the jury's verdict. *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). In contrast, the Double Jeopardy Clause does *not* bar retrial of a defendant when the defendant's conviction is set aside for trial error, such as erroneously admitted evidence. *Lockhart v. Nelson,* 488 U.S. 33, 40, 109 S.Ct. 285, 290, 102 L.Ed.2d 265 (1988) (finding no double jeopardy violation where a defendant was resentenced based on an additional felony conviction not offered or admitted at original sentencing).

■ The procedural error committed by the sentencing court at Hudspeth's initial sentencing hearing was simple trial error. We remanded simply to ask the sentencing court to expand the record on evidence that had already been received. A sentencing court's erroneous reliance on an insufficient record in imposing an enhanced sentence does not preclude correction of that sentence by a further review of the record. We hold that the Double Jeopardy Clause does not preclude the recalculation of a defendant's sentence enhancement initially vacated for an insufficient record.

### III.

### CONCLUSION

We hold that Hudspeth's 1983 convictions for three counts of burglary resulted from crimes "committed on occasions different from one another" and conclude that the district court's enhancement of Hudspeth's sentence pursuant to 18 U.S.C. § 924(e)(1) was proper. We also hold that the district court's recalculation of Hudspeth's sentence resulted in no double jeopardy violation.

The defendant's sentence is

AFFIRMED.

BAUER, Circuit Judge, concurring.

I concur. My concurrence is both simple and, as far as it goes, complete. I believe the defendant was appropriately sentenced because, in my opinion, the record shows three separate crimes against separate victims and not a single crime or criminal occasion (whatever that is).

FLAUM, Circuit Judge, with whom POSNER, Chief Judge, and ROVNER, Circuit Judge, join, concurring in part and dissenting in part.

At its core, this case requires us to determine the meaning of the statutory language "occasions different from one another," 18 U.S.C. § 924(e)(1), a phrase that most of us agree is ambiguous. The full court has divided roughly between those who believe the test of what is an "occasion" calls for a bright-line rule and those who believe that a fact-bound, case-by-case method is preferable. I write separately to explain why I believe the latter approach is better suited to the inquiry we are asked to make.

The statutory text and structure provide no clues as to precisely what Congress meant by the term "occasions"; Congress used the term without elaboration. As the principal opinions note, in grappling with the ambiguity of the ACCA, we (and other courts) have held that a different "occasion" means a "separate and distinct criminal episode," *United States v. Godinez,* 998 F.2d 471, 472 (7th Cir.1993); *United States v. Schieman,*

894 F.2d 909, 913 (7th Cir.), *cert. denied,* 498 U.S. 856, 111 S.Ct. 155, 112 L.Ed.2d 121 (1990), but this refinement is only marginally less ambiguous than the statutory provision it explains. The legislative history provides some illumination—we know that simultaneous crimes are to be counted as a single occasion—but not enough to dispose of this case as we are not told whether to make the negative inference that nonsimultaneous crimes cannot occur on one occasion. In my view, the import of the post-*Petty* amendment to the ACCA is that Congress has spoken clearly to a particular factual scenario (several robberies accomplished by the same "stick-em-up"), but has otherwise left to the courts the task of giving meaning to the phrase "committed on occasions different from one another." Thus, the amendment does not resolve, once and for all, that all cases involving several crimes committed hard on the heels of one another, though not simultaneously, count as different criminal occasions. Indeed, the snippet of legislative history cited in the majority opinion says as much—"a single multi-count conviction *could* still qualify where the counts related to crimes committed on different occasions." *See supra* at 14 (emphasis added). Sequential crimes can, and often will, involve multiple occasions, but this need not always be the case.

The majority concludes that Hudspeth ought to receive the ACCA enhancement on the basis of his three distinct aggressions against three separate victims in three separate locations. This approach has the apparent virtue of drawing a bright-line (between simultaneous and sequential crimes) that would make the law more predictable for defendants and easier to apply for courts.* For these reasons, Congress might rationally adopt such a rule, though I believe its mechanical application would lead to just as many, if not more, arbitrary results as a case-by-case approach would produce. For example, compare Hudspeth's situation with that of a defendant who breaks into a small office building (one address, one owner, one insurance company) and then pries his way into three locked offices within that building, absconding with all of the electronic equipment and petty cash he can find. It would be reasonable to conclude that Hudspeth and our hypothetical defendant are equally aggressive, dangerous, and culpable. Both could have ceased after a single entry, but instead chose to expand their illegal activities to two additional locations before stopping (or being stopped). Yet under the proposed bright-line rule, it is three strikes and you're out for Hudspeth while his more fortunate cohort remains in the batter's box with just one strike, though we can be reasonably certain that, like his brother in crime, Hudspeth sought cash and easily-fenced appliances and had no particular affinity for doughnuts, dry cleaning, or insurance—or knew or cared who owned what.

In my view, the text, structure, and history of the ACCA neither compel nor suggest this particular (or any) bright-line rule. Indeed, in view of the malleability of the relevant terms ("occasions different from one another" and "separate and distinct criminal episode"), *see United States v. Balascsak,* 873 F.2d 673 (3d Cir.1989) (*en banc*), *cert denied,* 498 U.S. 864, 111 S.Ct. 173, 112 L.Ed.2d 138 (1990), I find it quite plausible that Congress declined to define them more precisely so that judges could decide what is an "occasion" by applying an ordinary, every-day meaning to the myriad factual scenarios that arise. We have in the past rejected the notion that fact-dependent standards necessarily produce more inconsistent and arbitrary results than hard and fast rules, *see Morgan v. Bank of Waukegan,* 804 F.2d 970,

---

* But is this such a bright line after all—or does it simply substitute one ambiguity for another? Consider the burglar who enters a home and pilfers the television from the family room, the candlesticks from the living room, and some jewelry from the bedroom. Has he acted simultaneously or sequentially? Clearly he cannot grab all of these objects with one clean scoop of the arm (nor could one acting without the benefit of specialized equipment or a contortionist's talents rob or shoot six victims at precisely the same instant), and the proper characterization of the burglar's acts will turn on how much time we will tolerate between so-called "simultaneous" occurrences.

977 (7th Cir.1986), and we ought to do so again today. "[D]eveloping the law on a case-by-case basis and drawing lines depending on the facts is the stuff of judging," *Balascsak,* 873 F.2d at 685 (Becker, J., concurring), and over time this process shapes the contours of the law in such a way that future cases follow increasingly more predictably from those that preceded them. For example, we know from *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), and *Petty* that the simultaneous robbery of six persons counts as a single occasion while *Schieman* (involving an assault following a robbery) and *Godinez* (involving a kidnapping following a robbery) establish that one crime following soon after another can be a separate occasion. These cases guide our analysis of the instant case, though, in my view, they are not dispositive because Hudspeth's actions fall within the gray area between what the earlier cases establish as single and multiple occasions. While the lapse of time surely is an important factor in determining the number of "occasions" or "episodes", I read our cases to suggest that other practical considerations—whether the events in question reflect distinct aggressions or demonstrate heightened criminal culpability or dangerousness to society—also may be relevant. *See Godinez,* 998 F.2d at 472–73. Congress may, of course, amend the ACCA to guide courts with respect to what is an occasion, but unless and until it does, I believe that a nuanced, fact-based approach better resolves how many occasions are encompassed within a particular course of conduct. In this case, I find that Hudspeth's actions, like those of the hypothetical defendant sketched above, were the product of a single aggression and I view the fact that Hudspeth and his partners entered several attached but separate stores at sequential addresses, as opposed to, for example, several departments of a single larger store, to be a mere fortuity in these circumstances. In sum, I endorse Judge Ripple's fact-based approach and agree that we should reverse the sentence in this case.

RIPPLE, Circuit Judge, with whom POSNER, Chief Judge, and FAIRCHILD, FLAUM, and ROVNER, Circuit Judges, join, concurring in part and dissenting in part.

Thomas L. Hudspeth and several others broke into a shopping mall and, in thirty-six minutes' time, burglarized three stores. A bobtailed[1] en banc court holds that those thirty-six minutes qualify him as a career criminal. Because I believe that this holding is contrary to the intent of the Congress and constitutes a significant departure from the approach this court has taken in previous cases, I respectfully dissent.

## I

## BACKGROUND

A person who has a previous felony conviction may not legally possess a firearm. 18 U.S.C. § 922(g)(1). If a prior felon is convicted of the unlawful possession of a firearm under this statutory provision and has the requisite prior criminal history, he is considered a "career criminal" and must be sentenced under the mandatory sentence enhancement section of the ACCA, 18 U.S.C. § 924(e)(1).

On August 1, 1991, Mr. Hudspeth entered a plea of guilty to the charge of unlawful possession of a firearm by a convicted felon. Prior to the plea agreement, the government had notified Mr. Hudspeth that it would seek, pursuant to § 924(e)(1), the enhancement of his sentence to a term of imprisonment of not less than fifteen years with no possibility of parole. In its Information Charging Prior Offense, filed July 8, 1991, the government listed three previous violent felony convictions, all committed in Sangamon County, Illinois: (1) the August 8, 1983 conviction of three separate counts of burglary committed on March 27, 1983; (2) the October 30, 1980 conviction of burglary; and (3) the July 8, 1975 adjudication of juvenile delinquency for burglary. Following acceptance of Mr. Hudspeth's guilty plea, the district court found that he was a career crimi-

---

**1.** *See North Georgia Finishing, Inc. v. Di–Chem, Inc.,* 419 U.S. 601, 615, 95 S.Ct. 719, 726, 42 L.Ed.2d 751 (1975) (Blackmun, J., dissenting).

nal subject to the sentence enhancement.[2] Mr. Hudspeth appealed.

In an unpublished order, a panel of this court vacated the sentence and remanded the case for a hearing with respect to the § 924(e) enhancement. *United States v. Hudspeth*, No. 91–3786, 1992 WL 205666 (7th Cir. Aug. 20, 1992). It specifically directed the district court to examine the facts surrounding the juvenile burglary and the three 1983 convictions in deciding whether Mr. Hudspeth was convicted of three violent felonies as defined by the statute.[3] The court pointed out that, with respect to the 1983 burglaries at issue here, the record contained little information concerning the circumstances surrounding the commission of these crimes:

> The only information we have on the 1983 burglaries, however, is contained in the PSR, which summarily describes the burglaries as follows: "The defendant, Thomas Edwards, and Ronnie Edwards entered Homestyle Cleaners, Melocreme Donut, and Farmer's Insurance Company, all located in Springfield, Illinois." Defendant–Appellant's Appendix, at 45. This brief description of the burglaries does not reveal whether they took place on the

same day or weeks apart, whether the burglarized businesses are in the same building or across town, or whether the crimes were connected in any way. Further, the district court did not examine the facts surrounding these burglaries. Consequently, we do not have sufficient information to discern whether the 1983 burglaries were part of the same or separate and distinct criminal episodes, and therefore cannot decide whether Hudspeth's sentence was properly enhanced under § 924(e) (footnote omitted).

R.37 at 3. The court further noted that the government had never suggested that these 1983 convictions ought to be counted separately for purposes of § 924(e) until it amended its brief one week before oral argument in this court. Characterizing the attempt to proceed in this court on a basis not urged in the district court as "disturbing," the court admonished the government to state clearly the basis of the enhancement it was seeking during the remand proceedings in the district court.

On remand, the government and district court focused only on the 1983 conviction of three counts of burglary.[4] The pertinent facts are as follows. Around 7:15 p.m. on

---

**2.** Mr. Hudspeth was sentenced on November 26, 1991. The court determined that the total offense level was 31; the criminal history category was V; the range of imprisonment was 180–210 months; the range of supervised release was 3–5 years; and the range of fine was $15,000 to $150,000. It then sentenced him to a term of imprisonment of 180 months.

**3.** In the unpublished order, this court also stated that it could not determine whether Mr. Hudspeth's adjudication of delinquency in 1975, a juvenile burglary conviction, was a "violent felony" that would count for the purposes of § 924(e). At the hearing on remand, the government acknowledged that it would offer no evidence with respect to that adjudication. R.59 at 9–10. The government further commented that there was "no contest" as to the second item listed in the information, the adult conviction for burglary in May 1979. *Id.*

**4.** The charge of burglary to which Mr. Hudspeth pled guilty is a class 2 felony in Illinois. 720 ILCS 5/19–1. Because that state statute has been found to be broader than the generic definition of burglary found in *Taylor v. United States,*

495 U.S. 575, 599, 110 S.Ct. 2143, 2158, 109 L.Ed.2d 607 (1990), the sentencing court is required to review the charging paper and jury instructions to determine whether all the elements of generic burglary are present. *Id.; United States v. Howell*, 37 F.3d 1197, 1206–07 (7th Cir.1994); *United States v. Simpson*, 974 F.2d 845, 849 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1326, 122 L.Ed.2d 711 (1993). Nothing in the record indicates that the district court examined those papers from state court. However, the defendant did not raise this issue before the district court, nor does he raise it on appeal. It is not critical to our decision for two reasons. First, it may be that "trial counsel obtained the charging papers, recognized that they satisfy *Taylor,* and saw no point in insisting that the record be padded with evidence adverse to his client." *United States v. Davenport*, 986 F.2d 1047, 1050 (7th Cir.1993); *see also United States v. Davis*, 16 F.3d 212, 215 n. 4 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 354, 130 L.Ed.2d 309 (1994) (No. 93–9130). Second, the charging papers and certificates of judgment were presented in evidence to the district court at the resentencing proceeding, and they clearly fulfill the *Taylor* requirements.

March 27, 1983, Mr. Hudspeth and two others broke into three adjacent stores in the Laketown Shopping Center, a strip mall in Springfield, Illinois. There is a factual ambiguity in the record as to the point of entry from the exterior of the mall.[5] In just over one-half hour, they ransacked a doughnut shop, a cleaning business, and an insurance agency. A hole had been punched into the wall between the cleaners and the doughnut shop, allowing passage between those stores, and the door between the doughnut shop and the insurance company had been opened. In the cleaners was a canvas bag containing such tools as chisels, screwdrivers, pry bars, a pipe wrench and a small sledgehammer. Mr. Hudspeth was arrested in the doughnut shop.

After the resentencing hearing, the district court concluded that the burglaries in the mall constituted three "separate crimes against separate victims in separate locations." The court reasoned that the defendant "could have stopped after one burglary but he consciously made a decision to break through the walls and burglarize one business after another." Order of Feb. 1, 1993, R.51 at 2. On that basis, the court held that Mr. Hudspeth qualified for the § 924(e) enhancement.

## II

Mr. Hudspeth asserts that the recalculation of his sentence placed him in jeopardy twice for the same offense.[6] If he is correct, the Double Jeopardy Clause bars his resentencing, and it would be unnecessary to consider further the other matters raised on appeal. Accordingly, I address this issue first. A double jeopardy allegation is a legal question which we review de novo. *United States v. Furlett*, 974 F.2d 839, 842 (7th Cir.1992).

### 1.

The Double Jeopardy Clause provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const., amend. V. The Clause

---

**5.** As the government noted at oral argument, the record simply does not reveal the precise sequence of the burglaries. The police reports, Government's Exhibit 2, were submitted at the resentencing hearing on February 1, 1993. Mr. Hudspeth maintains that he and his confederates entered through the doughnut shop. He was apprehended in this space. The government claims that the cleaners was the point of entry. The reports of Officers Wubker, Pisarek and Avart, who were on the scene of the burglary, state that the rear door of the cleaning establishment had been pried open and that the door was ajar. None of the officers observed their entry. Officer M. Laughlin, the only one to see the three men in the alley, stated:

I observed two white males standing in a far northwest corner of Laketown Shopping Center. Another white male came from the east, or front, parking area of Laketown and walked up to the other two white males in the northwest corner behind a garbage dumpster. I watched the three suspects crouching, stand up and look around, and croutch [sic] again. A few moments later, the three white males walked out of the shadow area and walked to the next rear door south and croutched [sic] again. I checked the parking lot area for a moment, when I looked back, all three white males had disappeared.

The report of Officer Rachford, who arrived at the shopping center after two of the three were in custody, stated:

Actual entry into the building was through the back door to the doughnut shop. The back door to the laundry was standing open, but it was opened from the inside because it cannot be opened from the outside.

There are other discrepancies in the reports. Officer Wubker reported that three officers kicked open the back door to the cleaners; Officer Avart, however, stated that he "started to ease the door open gently. As the door started to open, the R/A then felt a resistance as though someone was on the other side of the door ready to shut it. The R/A then forced the door open, announced, 'halt police' and proceeded into the building followed by S/A Wubker and Officer Pisarek." Also, several summaries stated that tools were lying on the floor of the cleaners, but Officer Pisarek "observed several tools in the *businesses.*" Detective Rachford's statement specifically mentioned that "[t]here was no evidence in the Insurance Agency or Doughnut Shop, but in the laundromat R/D recovered several pieces of evidence" which he then listed. Neither party presses before us these factual ambiguities and we do not have the benefit of a judicial finding by the district court with respect to the matter.

**6.** Mr. Hudspeth raised the double jeopardy issue in his sentencing memorandum, filed the day before the resentencing hearing. The memorandum asserted that double jeopardy prohibited resentencing, but did not move explicitly to dismiss the case on that ground. The district court proceeded to recalculate Mr. Hudspeth's sentence without adjudicating his double jeopardy claim. Its decision to continue with the resentencing proceeding is impliedly a denial of the defendant's request for dismissal.

"affords a defendant three basic protections: ' "[It] protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." ' " *Ohio v. Johnson,* 467 U.S. 493, 498, 104 S.Ct. 2536, 2540, 81 L.Ed.2d 425 (1984) (citations omitted). In this latter regard, the Double Jeopardy Clause ensures that "sentencing courts do not exceed, by the device of multiple punishments, the limits prescribed by the legislative branch of government, in which lies the substantive power to define crimes and prescribe punishments." *Jones v. Thomas,* 491 U.S. 376, 381, 109 S.Ct. 2522, 2525–26, 105 L.Ed.2d 322 (1989). Courts may not impose multiple punishments for the same offense in excess of the total punishment authorized by the legislature. *United States v. Halper,* 490 U.S. 435, 450–51, 109 S.Ct. 1892, 1902–03, 104 L.Ed.2d 487 (1989).

### 2.

At the outset, it is necessary to clarify the precise issue before the court by addressing several threshold matters raised by Mr. Hudspeth. First, no additional factual bases were proffered by the government at resentencing. Both the sentence initially imposed upon Mr. Hudspeth and the sentence imposed after remand from this court were based upon the same factual predicate; no other convictions or other aspects of Mr. Hudspeth's past criminal history were included for the first time in the resentencing calculations. Second, Mr. Hudspeth's claim that he was uninformed of the prior offenses is without merit. The Information Charging Prior Offenses adequately notified the defendant of the predicate convictions on which the government relied for purposes of enhancement. This information was filed on July 8, 1991, eighteen days after the indict-

ment was returned and twenty-three days before Mr. Hudspeth signed the plea agreement. It stated that these prior convictions would justify enhancement of Mr. Hudspeth's sentence under § 924(e) if he were convicted. The plea agreement, which Mr. Hudspeth signed, also listed the predicate convictions. Through these steps, the government clearly gave the defendant adequate notice of the prior convictions upon which it sought enhancement.[7] The Supreme Court's decision in *Oyler v. Boles,* 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962), upon which Mr. Hudspeth relies, requires that the defendant "receive reasonable notice and an opportunity to be heard relative to the recidivist charge." *Id.* at 452, 82 S.Ct. at 504. The government met its burden by providing timely notice (the Information Charging Prior Offenses) and proof of the validity of the prior convictions. Mr. Hudspeth had the opportunity to contest the record as to his prior convictions both before signing the plea agreement and at the sentencing hearing. He had a further opportunity to challenge the government's position concerning the 1983 burglary conviction during the proceedings upon remand. Mr. Hudspeth's threshold allegations are without merit.

### 3.

I now turn to Mr. Hudspeth's principal contention with respect to the Double Jeopardy Clause. In his view, by "unbundling" the 1983 conviction on remand, the government initially premised its request for enhancement of the sentence on one version of his criminal conviction history and then, on remand, premised a second request for enhancement on a second version.

At the outset, I note that, although the precise contours of the protection against double jeopardy in the non-capital sentencing context may not be entirely settled,[8] existing

---

**7.** At the resentencing hearing, the government did submit to the district court copies of the state charging papers and judgments of conviction. There is no record whether the evidence was before the court at the first sentencing hearing.

**8.** The Supreme Court granted certiorari in *Bohlen v. Caspari,* 979 F.2d 109 (8th Cir.1992), *cert. granted,* —— U.S. ——, 113 S.Ct. 2958, 125

L.Ed.2d 660 (1993), on the question whether the Double Jeopardy Clause, which prohibits the state from subjecting a defendant to successive capital sentencing proceedings, applies to successive noncapital sentence enhancement proceedings. However, because the Court resolved the case on *Teague* grounds, it did not answer the double jeopardy issues. *Caspari v. Bohlen,* ——

caselaw makes it highly unlikely that the Double Jeopardy Clause is implicated in the situation at hand. As the Supreme Court pointedly noted in *United States v. DiFrancesco,* 449 U.S. 117, 134, 101 S.Ct. 426, 436, 66 L.Ed.2d 328 (1980), a sentencing matter does not ordinarily have the "qualities of constitutional finality that attend an acquittal." As a general rule, therefore, the caselaw has maintained that recidivist statutes imposing enhanced sentences on repeat offenders do not violate the Double Jeopardy Clause. *Spencer v. Texas,* 385 U.S. 554, 559–60, 87 S.Ct. 648, 651, 17 L.Ed.2d 606 (1967);[9] *Denton v. Duckworth,* 873 F.2d 144, 147 (7th Cir.), *cert. denied,* 493 U.S. 941, 110 S.Ct. 341, 107 L.Ed.2d 330 (1989);[10] *United States v. Vigil,* 818 F.2d 738, 742 (10th Cir.1987);[11] *United States v. Pleasant,* 730 F.2d 657, 662 (11th Cir.), *cert. denied,* 469 U.S. 869, 105 S.Ct. 216, 83 L.Ed.2d 146 (1984);[12] *United States v. Bowdach,* 561 F.2d 1160, 1176 (5th Cir.1977).[13] This court has clearly stated that sentence enhancement under the Sentencing Guidelines does not create multiple punishments for a crime in violation of the double jeopardy clause. *United States v. Duarte,* 28 F.3d 47, 48 (7th Cir.1994) (finding no double jeopardy in U.S.S.G. § 3C1.1 obstruction of justice enhancement); *United States v. Shaw,* 26 F.3d 700, 701 (7th Cir. 1994) (finding no error in use of prior conviction to enhance another sentence because it

is not a "second punishment" for the first crime); *United States v. Saunders,* 973 F.2d 1354, 1365 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1026, 122 L.Ed.2d 171 (1993) (holding that calculation of sentence within statutory range does not constitute multiple punishment); *accord United States v. Howard,* 998 F.2d 42, 48–49 (2d Cir.1993) (holding that cumulative punishments upon recidivist defendants do not violate Double Jeopardy Clause).

I do not believe there is any reason to treat differently "career criminal" sentence enhancement under the ACCA. In this case, both the original and second sentences were within the sentencing range and were made on the basis of the same predicate convictions. The statutory scheme is designed to remove from society for a longer period of time those individuals who have demonstrated, because of their recurring violent behavior, that they are an unusual danger to others.

Nor do I agree that the fact that the government, on remand, for the first time characterized the convictions based on the events of March 27, 1983 as three episodes necessarily alters the above analysis and implicates the strictures of the Double Jeopardy Clause. However, even if I were to assume *arguendo* that the Double Jeopardy Clause is applicable in this situation, my

---

U.S. ——, ——, 114 S.Ct. 948, 957, 127 L.Ed.2d 236 (1994).

I note that, in *Caspari,* the state was required to prove the existence of the predicate offense beyond a reasonable doubt. Therefore, arguably, the existence of the offense was an element of the state conviction. In the case of the ACCA, the predicate conviction is not an element of the offense and the government is not required to prove its existence beyond a reasonable doubt.

9. "No claim is made here that recidivist statutes are themselves unconstitutional, nor could there be under our cases.... Such statutes ... have been sustained in this Court on several occasions against contentions that they violate constitutional strictures dealing with double jeopardy." *Spencer,* 385 U.S. at 559–60, 87 S.Ct. at 651.

10. In *Denton* we held that the Indiana recidivist statute does not impose additional punishment for a past crime but rather imposes additional punishment for the later crime and therefore does not violate the Double Jeopardy Clause.

11. "[W]hether punishments are in fact multiple and violative of the Double Jeopardy Clause involves first a task of ascertaining legislative intent." *Vigil,* 818 F.2d at 741 (citing *Ohio v. Johnson,* 467 U.S. 493, 499, 104 S.Ct. 2536, 2540–41, 81 L.Ed.2d 425 (1984); *Missouri v. Hunter,* 459 U.S. 359, 368–69, 103 S.Ct. 673, 679–80, 74 L.Ed.2d 535 (1983); *Whalen v. United States,* 445 U.S. 684, 688–89, 100 S.Ct. 1432, 1435–36, 63 L.Ed.2d 715 (1980)).

12. In *Pleasant* the Eleventh Circuit noted that the application of a recidivist statute is not additional punishment for an earlier crime, but a recognition that the repetition of criminal conduct aggravates the commission of the later crime and warrants imposition of the longer sentence.

13. In *Bowdach* the Fifth Circuit reiterated that enhancement is not punishment for earlier crime but additional punishment for later crimes because it has been aggravated by the earlier crime.

analysis would be guided by the decision of the Supreme Court in *Lockhart v. Nelson,* 488 U.S. 33, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988). In *Nelson,* the trial court, sentencing the defendant under a state habitual criminal statute,[14] admitted evidence of four felony convictions. It was discovered later that one of the offenses had been pardoned. When the State announced its intention to resentence the defendant as an habitual offender on the basis of a conviction not offered or admitted at the original sentencing hearing, the defendant raised the defense of double jeopardy. Chief Justice Rehnquist, writing for the Court, noted that, in *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), the Court had recognized an exception to the general rule that double jeopardy does not bar retrial when a defendant has succeeded in getting his conviction set aside for error in the earlier proceedings. *Id.* at 39, 109 S.Ct. at 290. *Burks* held that, when a defendant's conviction is reversed on the ground of insufficient evidence to sustain the jury's verdict, the Double Jeopardy Clause bars a retrial on the same charge because such a holding amounts to a determination that the trial court should have entered a judgment of acquittal on the ground of insufficient evidence. The Chief Justice concluded that the "logic of *Burks* " requires that the Double Jeopardy Clause not bar retrial when a reviewing court determines that a conviction must be reversed because evidence was admitted erroneously and, without that evidence, the defendant could not have been convicted due to insufficient evidence. *Id.* at 40, 109 S.Ct. at 290. He wrote:

> *Burks* was careful to point out that a reversal based solely on evidentiary insufficiency has fundamentally different implications, for double jeopardy purposes, than a reversal based on such ordinary "trial errors" as the "incorrect receipt or rejection of evidence." 437 U.S. at 14–16, [98 S.Ct. at 2148–50]. While the former is in effect

a finding "that the government has failed to prove its case" against the defendant, the latter "implies nothing with respect to the guilt or innocence of the defendant," but is simply "a determination that [he] has been convicted through a judicial *process* which is defective in some fundamental respect." *Id.* at 15, 98 S.Ct. at 2149 (emphasis added).

*Nelson,* 488 U.S. at 40, 109 S.Ct. at 290. He further explained that "[t]he fact that one of the convictions had been later pardoned by the Governor vitiated its legal effect, but it did not deprive the certified copy of that conviction of its probative value under the statute." *Id.* In the Court's view, the admission of the pardoned conviction therefore amounted to "trial error."

> Permitting retrial in this instance is not the sort of governmental oppression at which the Double Jeopardy Clause is aimed; rather, it serves the interest of the defendant by affording him an opportunity to "obtai[n] a fair readjudication of his guilt free from error."

*Id.* at 42, 109 S.Ct. at 291 (quoting *Burks,* 437 U.S. at 15, 98 S.Ct. at 2149).

The circumstances creating trial error in *Nelson* are similar, although not identical,[15] to those now before this court. In *Nelson,* a defendant pleaded guilty to burglary and was sentenced under the state's habitual criminal statute. Prior felony convictions were introduced at the sentencing hearing. A subsequent issue concerning one of those prior convictions arose after sentencing—the pardon of one of the convictions. At that point the government announced that it intended to rely on another prior conviction not offered or admitted at the initial sentencing hearing. In this case, however, the subsequent issue was the insufficiency of the information about Mr. Hudspeth's predicate convictions. Also in this case, unlike in *Nelson,* the government relied on the convictions in-

---

**14.** Under the Arkansas scheme, the state has the burden of proving the existence of the predicate conviction beyond a reasonable doubt. Arguably, therefore, it is an element of the offense and its proof implicates, for that reason, the Double Jeopardy Clause. Because the state did not question the applicability of the double jeopardy clause to its recidivist statute, the Court assumed

that it was applicable. *See Nelson,* 488 U.S. at 37–38 n. 6, 109 S.Ct. at 289 n. 6.

**15.** In the present case, the government did not attempt at the resentencing to introduce any new material in aggravation, but merely "unbundled" the 1983 convictions previously before the court.

troduced in the earlier proceeding; it simply characterized the 1983 burglary conviction as three separate and distinct episodes justifying enhancement.

As in *Nelson,* the procedural error from Mr. Hudspeth's first sentencing was simple trial error. We remanded because the information presented by the district court to the court of appeals was insufficient to discern the propriety of the enhancement, not because the evidence presented by the government was insufficient to support a conviction. We requested an expansion of the record on the evidence that had already been received. A sentencing court's failure to present an adequate record of the evidence used for enhancement of the sentence does not lead to the type of sentence correction that is barred by double jeopardy. This is not a "case of the state getting a second chance to prove something it had failed to prove the first time, the heart of double jeopardy's bar." *Tate v. Armontrout,* 914 F.2d 1022, 1026–27 (8th Cir.1990) (concluding that an insufficient record was trial error); *see also Linam v. Griffin,* 685 F.2d 369, 374 (10th Cir.1982) (holding that double jeopardy does not bar retrial when evidence is incorrectly excluded), *cert. denied,* 459 U.S. 1211, 103 S.Ct. 1207, 75 L.Ed.2d 447 (1983).

In reaching the conclusion that the Double Jeopardy Clause is not violated by the reconsideration of the three convictions entered in the original proceeding, I follow a path analogous to that set out in this court's decision in *Denton v. Duckworth,* 873 F.2d 144, 148 (7th Cir.), *cert. denied,* 493 U.S. 941, 110 S.Ct. 341, 107 L.Ed.2d 330 (1989). There we concluded that, assuming that the Double Jeopardy Clause applies, it does not bar redeter-

mination of a defendant's status as an habitual offender under the Indiana habitual offender statute when the basis of that remand is trial error. Today, again assuming the applicability of the Clause, I conclude that the Double Jeopardy Clause does not affect the recalculation of a sentence enhancement that was vacated for an insufficient record, a trial error. Therefore, there was no double jeopardy violation in the redetermination of Mr. Hudspeth's status as a career criminal under § 924(e) of the ACCA.

### III

Mr. Hudspeth contends that the 1983 burglaries of three adjoining stores in the same building within thirty-six minutes was a single project and therefore must, as a matter of law, constitute a single episode for purposes of the § 924(e) enhancement.[16] The government responds that the burglaries constituted separate entries into three separate stores and included an independent choice to continue on after each burglary.

The ACCA requires that a series of determinations be made before its heavy penalties are imposed: The offender must be a felon convicted of illegal possession of a firearm, and thus in violation of § 922(g), and must have had three previous convictions for a violent felony and/or serious drug offense which were committed on occasions different from one another under § 924(e). When these statutory requirements are met, the offender is categorized as a career criminal and the mandatory enhanced sentence of not less than fifteen years of imprisonment without eligibility for parole, probation, or suspended sentence is imposed.[17]

---

16. Section 924(e)(1) of the ACCA establishes the requisites for a fifteen-year minimum sentence:

   In the case of a person who violates section 922(g) of this title and has three previous convictions by any court ... for a violent felony or a serious drug offense, or both, committed on occasions different from one another, such person shall be fined not more than $25,000 and imprisoned not less than fifteen years[.]

17. Mandatory minimum sentences implement the ACCA's policy of "selective incapacitation," the purpose of which is to "select" a particular class of offenders for "incapacitation" or long incarceration. James E. Hooper, Note, *Bright*

*Lines, Dark Deeds: Counting Convictions Under the Armed Career Criminal Act,* 89 Mich.L.Rev. 1951, 1953 (1991).

   To the extent that the criminal justice system identifies some criminals as unresponsive to rehabilitative treatment or deterrence, and expects them to offend again, the case for incapacitating them—denying them the opportunity to commit crimes by locking them up for long periods of time—is especially strong. If the government cannot expect to change these criminals' behavior, it can at least isolate them and thereby protect society from their future crimes.

From the beginning, the purpose of this statute has been clear. Congress intended to devise a mechanism that would identify the offender whose repeated aggressions against society pose a special danger to law-abiding persons and would isolate that person from society for a longer period of time. *See Armed Career Criminal Act: Hearing on H.R. 1627 and S. 52 Before the Subcomm. on Crime of the House Judiciary Comm.*, 98th Cong., 2d Sess. 12–13 (1984) (setting forth Senator Specter's comments that Act was promulgated to punish habitual offenders); S.Rep. No. 585, 97th Cong., 2d Sess. 20 (1982) (discussing congressional intent to punish the small number of repeat offenders committing most of the violent crime in America). The decision of the Eighth Circuit in *United States v. Petty*, 798 F.2d 1157 (8th Cir.1986), *vacated*, 481 U.S. 1034, 107 S.Ct. 1968, 95 L.Ed.2d 810 (1987) was the early case that focused attention on the purpose of the statute. Petty robbed six persons in a restaurant at the same time. The Eighth Circuit initially held that the loss to six different victims constituted six different offenses and therefore required an enhancement of the sentence. The Supreme Court vacated the judgment and instructed the appellate court to reconsider in view of the Solicitor General's position that offenses should be counted separately only if they occurred at different times, and that "career criminal" status should reflect a history of "multiple criminal episodes" rather than multiple convictions arising from a single "episode." *Petty*, 481 U.S. at 1034–35, 107 S.Ct. at 1968–69. On remand, the Eighth Circuit adopted that approach and held that the simultaneous robberies created one criminal episode. *United States v. Petty*, 828 F.2d 2, 3 (8th Cir.1987), *cert. denied*, 486 U.S. 1057, 108 S.Ct. 2827, 100 L.Ed.2d 928 (1988). Our colleagues in the Eighth Circuit noted, "the legislative history [of the ACCA] strongly supports the conclusion that the statute was intended to reach multiple criminal episodes that were distinct in time, not multiple felony convictions arising out of a single criminal episode." *Petty*, 828 F.2d at 3.

A subsequent amendment made clear that the position of the Solicitor General was indeed correct. Congress specifically directed that the predicate felonies be "committed on occasions different from one another." Senator Joseph Biden, Chairman of the Senate Judiciary Committee, explained the amendment of the ACCA by the Anti–Drug Abuse Act of 1988, Pub.L. No. 100–690, section 7056, 102 Stat. 4181, 4402 (1988):

> Under the amendment, the three previous convictions would have to be for offenses "committed [on] occasions different from one another." Thus, a single multicount conviction could still qualify where the counts related to crimes committed on different occasions, but a robbery of multiple victims simultaneously (as in Petty) would count as only one conviction. This interpretation plainly expresses that concept of what is meant by a "career criminal," that is, a person who over the course of time commits three or more of the enumerated kinds of felonies and is convicted therefor. It is appropriate to clarify the statute ... to insure that its rigorous sentencing provisions apply only as intended in cases meriting such strict punishment.

134 Cong.Rec. S17,370 (daily ed. Nov. 10, 1988).

This amendment does not provide an answer on the cold print of the statute books to the fact-specific case before us. However, when read with the rest of the legislative history and the interpretation given the statute by the Supreme Court, the congressional objective can hardly be in doubt. The Supreme Court, reviewing the legislative history of the ACCA, noted the aim of the Act at recidivist defendants:

> [T]hroughout the history of the enhancement provision, Congress focused its efforts on career offenders—those who commit a large number of fairly serious crimes as their means of livelihood, and who, because they possess weapons, present at least a potential threat of harm to persons.

*Taylor v. United States*, 495 U.S. 575, 587–88, 110 S.Ct. 2143, 2152, 109 L.Ed.2d 607 (1990); Chief Judge Posner has described a career criminal as "incorrigible, undeterra-

*Id.* at 1953–54 (collecting articles concerning se-

lective incapacitation policy).

ble, recidivating, unresponsive to the 'specific deterrence' of having been previously convicted." *United States v. Belton,* 890 F.2d 9, 10 (7th Cir.1989) (considering career offender enhancement under U.S.S.G. § 4B1.1), *cert. denied,* —— U.S. ——, 113 S.Ct. 391, 121 L.Ed.2d 299 (1992).

Until today, our decisions have reflected a thoughtful and measured approach to the task required by the statute—identifying those criminals whose repetitive behavior requires a special degree of isolation from society. Our previous decisions in this area, and, indeed, the previous decisions of the other circuits, have attempted to fulfill the congressional mandate by a progressive refinement of the methodology to be employed by the trial courts in determining whether the previous crimes of the defendant constitute a single episode or multiple episodes. In *United States v. Schieman,* 894 F.2d 909, 912 (7th Cir.), *cert. denied,* 498 U.S. 856, 111 S.Ct. 155, 112 L.Ed.2d 121 (1990), we adopted, through the pen of Judge Bauer, the "separate and distinct criminal episode" test to determine whether the defendant's prior felonies were committed on different occasions as required by § 924(e). *Id.* at 913. Our later cases have continued to apply this test.[18] The vast majority of other courts of appeals have also adopted it.[19] The application of the "separate and distinct episodes" test has, of necessity, been quite fact specific. Yet, when assessed in its entirety, the caselaw reflects both an awareness that Congress' intent in enacting the section was to punish recidivist behavior and the reality that such recidivism can be manifest in relatively short time frames and in situations not far removed from each other.[20] These cases demonstrate that courts usually have counted

---

18. *See United States v. Patterson,* 23 F.3d 1239, 1256 (7th Cir.1994); *United States v. Godinez,* 998 F.2d 471, 472 (7th Cir.1993); *United States v. White,* 997 F.2d 1213, 1218–19 (7th Cir.1993).

19. *See, e.g., United States v. Wilson,* 27 F.3d 1126, 1131 (6th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 452, 130 L.Ed.2d 361 (1994); *Rodriguez v. United States,* 17 F.3d 225, 226 (8th Cir.1994); *United States v. Liquori,* 5 F.3d 435, 437 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 738, 126 L.Ed.2d 701 (1994); *United States v. Hamell,* 3 F.3d 1187, 1191 (8th Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1121, 127 L.Ed.2d 430 (1994); *United States v. Brady,* 988 F.2d 664, 668 (6th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 166, 126 L.Ed.2d 126 (1993); *United States v. Green,* 967 F.2d 459, 462 (10th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 435, 121 L.Ed.2d 355 (1992); *United States v. Carpenter,* 963 F.2d 736, 742 (5th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 355, 121 L.Ed.2d 269 (1992); *United States v. Mitchell,* 932 F.2d 1027, 1028 (2d Cir.1991); *United States v. Anderson,* 921 F.2d 335, 340 (1st Cir.1990); *United States v. Schoolcraft,* 879 F.2d 64, 74 (3d Cir.), *cert. denied,* 493 U.S. 995, 110 S.Ct. 546, 107 L.Ed.2d 543 (1989).

20. *See, e.g., Wilson,* 27 F.3d at 1131 (holding that two sexual attacks on same date, in same building but on different floors and locations, against separate victims, were separate offenses); *United States v. Lloyd,* 13 F.3d 1450, 1454 (10th Cir. 1994) (holding that two felonies committed on same day were separate occasions); *Hamell,* 3 F.3d at 1191 (holding that the stabbing of one victim in tavern, shooting of another victim outside tavern 25 minutes later, were separate as-saults); *United States v. Rideout,* 3 F.3d 32, 35 (2d Cir.) (holding that break-in of different residences 12 miles apart, 20–30 minutes from one another, are treated separately for purposes of ACCA), *cert. denied,* —— U.S. ——, 114 S.Ct. 569, 126 L.Ed.2d 469 (1993); *Godinez,* 998 F.2d at 473 (holding that kidnapping of woman, leaving her bound in apartment, then leaving to rob store, all done in rapid succession, are treated as distinct aggressions against different victims in different places); *Brady,* 988 F.2d at 668–69 (holding that armed robberies of different victims at different places and distinctly different, albeit very short, periods of time, were treated as separate predicate offenses); *United States v. Antonie,* 953 F.2d 496, 499 (9th Cir.1991) (counting separately two armed robberies on same evening, 40 minutes apart, involving different times, places, and victims), *cert. denied,* —— U.S. ——, 113 S.Ct. 138, 121 L.Ed.2d 91 (1992); *United States v. Tisdale,* 921 F.2d 1095, 1099 (10th Cir.1990) (holding that burglaries of two businesses and post office in shopping mall at the same time were separate incidents involving separate decisions), *cert. denied,* —— U.S. ——, 112 S.Ct. 596, 116 L.Ed.2d 619 (1991); *United States v. Washington,* 898 F.2d 439, 442 (5th Cir.) (holding that two robberies, a few hours apart, of same clerk at same store were deemed separate criminal acts), *cert. denied,* 498 U.S. 842, 111 S.Ct. 122, 112 L.Ed.2d 91 (1990); *Schieman,* 894 F.2d at 913 (holding that burglary of store, then aggravated battery on police officer a few minutes later were separate criminal acts against separate victims in separate locations); *United States v. Wicks,* 833 F.2d 192, 194 (9th Cir.1987) (per curiam) (holding that two burglaries on same night at different locations and times were separate criminal episodes), *cert. denied,* 488 U.S. 831, 109 S.Ct. 87, 102 L.Ed.2d 63 (1988).

separately all convictions (or counts within a conviction) that occurred at distinct times or involved different locations or distinguishable criminal schemes. By contrast, a crime involving multiple offenses occurring simultaneously has been held to be a single episode counting as a single conviction under § 924(e)(1).[21] Factors of time and distance must be evaluated in terms of the legislative intent in order to identify and segregate the true recidivist.

The next significant attempt to refine further our effort to fulfill the congressional mandate occurred in *United States v. Godinez*, 998 F.2d 471 (7th Cir.1993). In that case, Judge Easterbrook's analysis made it clear that the distinction between one and multiple episodes must, in order to reflect accurately the congressional intent, be a practical distinction rather than a metaphysical one. In *Godinez*, the defendant kidnapped a woman in order to use her car in a robbery. After leaving her tied up in his apartment, the defendant proceeded to rob a convenience store. The court emphasized that the starting point in the analysis must be the language of the statute; that language directs the implementation of the enhanced punishment scheme when the crimes took place "on occasions different from one another." *Id.* at 472. In an attempt to deal with the recurring problem of proximity in time or distance, the court held that, in order to constitute a separate episode, the crimes must reflect distinct aggressions. In fashioning this approach, the court noted with approval the analysis of the Second Circuit in *United States v. Towne*, 870 F.2d 880, 888–91 (2d. Cir.), *cert. denied*, 490 U.S. 1101, 109 S.Ct. 2456, 104 L.Ed.2d 1010 (1989). The Second Circuit found that a defendant's kidnapping and rape of one victim were "part of a continuous course of conduct which was directed at a single victim," even though there were different felonies committed with some period of time between the two crimes. Thus the attacks were a single criminal episode. *Id.* at 891. Judge Easterbrook contrasted Godinez's crimes against different victims, in different places, more than an hour apart: "It would strain language considerably, without serving any purpose plausibly attributed to Congress, to treat the kidnapping and the robbery as a single 'occasion.'" *Godinez*, 998 F.2d at 473.

In a very short period of time, Mr. Hudspeth and his accomplices, with a sledgehammer and other tools, broke into three adjoining businesses in one location and ransacked them. Their arrival with such tools designed to expedite the penetration of the walls between the adjacent businesses reflects a clear plan for the group to work together to break through from one business to another. This venture did not comprise "distinct aggressions," *id.*, but rather a singular, continuous course of conduct that depended on the spatial proximity of these stores. To characterize this venture as a single criminal act that, after reflection, Mr. Hudspeth and his cohorts chose to extend into a second and then a third shop requires that we ignore the counsel of *Godinez* that such assessments be based on the practical realities of the situation rather than on the metaphysical possibility that, at any given point in the activity, one of the perpetrators might have had a change of heart. Indeed, as the differences of opinion in the police reports reflect, the record does not establish any particular sequence to the perpetrators' activity, much less any deliberate choice on their part.

The majority asserts that the facts of this case are virtually identical to the circumstances in *United States v. Tisdale*, 921 F.2d 1095 (10th Cir.1990), *cert. denied*, —— U.S. ——, 112 S.Ct. 596, 116 L.Ed.2d 619 (1991). Indeed, there are clear superficial similari-

---

**21.** *See, e.g., United States v. Towne*, 870 F.2d 880, 891 (2d Cir.) (treating for enhancement purposes four convictions—a kidnapping and rape in 1976, and a kidnapping and rape in 1983—as two criminal episodes, each one an attack against one victim in one location), *cert. denied*, 490 U.S. 1101, 109 S.Ct. 2456, 104 L.Ed.2d 1010 (1989); *Petty*, 828 F.2d at 3 (holding that simultaneous robbery of six people in a restaurant was a single crime); *United States v. Montgomery*, 819 F.2d 847, 850 (8th Cir.1987) (government conceding that simultaneous robbery of two people was a single crime); *United States v. Aloi*, 773 F.Supp. 55, 69 (N.D. Ohio 1991) (holding that two burglaries counted as only one offense because they constituted a crime spree), *aff'd in part, vacated on other grounds*, 9 F.3d 438, 442 (6th Cir.1993) (noting that the government did not challenge the finding that the two burglaries were one offense).

ties. In *Tisdale,* the burglar broke into three stores in one mall in one evening. The Tenth Circuit held that breaking and entering of the three separate stores within the mall were burglaries of separate locations that could not occur simultaneously. Moreover, concluded the court, because the defendant chose to continue his burglaries after successfully completing one, he had engaged in separate criminal episodes. *Id.* at 1099. The court's rather terse treatment of the issue makes it difficult to assess with any accuracy whether the cases are similar beyond the fact that they both involve break-ins in a shopping mall in one evening. It is not difficult to conceive of a situation in which the location of the stores to each other, the time involved, and the modus operandi would make it clear that more than one aggression took place. *Tisdale,* therefore, may present, for purposes of the ACCA, a very different situation from the one before us. If, on the other hand, it is factually indistinguishable from our case, I suggest that it cannot fit within the analysis that we carefully have developed over the years to identify recidivist behavior and to deal with it as Congress has mandated. Here, the contiguous layout of the stores, the very short time involved in the execution of the entire plan, and the fact that the thieves treated the operation, both in its planning and its execution, as a unitary matter make it, for purposes of fulfilling the congressional intent, similar to the robbery of the six restaurant patrons in *Petty.* It stretches both the English language and the realities of the situation to conclude that this situation was anything · other than a single occasion.

Today, the court abandons the careful, thoughtful work-product of its past decisions in favor of an approach that, superficially, presents a more "bright-line" approach. It does so at a great price—abandonment of the congressional mandate that the statute be used to identify the true recidivist and to treat that person differently because of the special danger that person poses to the rest of us. The abandonment of our precedent is even more regrettable when one reflects on the future course of litigation in this area. The majority appears to admit that the assailant who enters an apartment with an automatic weapon and shoots several people with one burst of his weapon is not subject to the provisions of this statute. On the other hand, if he takes several steps around a room divider and shoots several others, the statute becomes operative because, at least in some metaphysical sense, he had time to think about the second pull of the trigger. The crimes described above no doubt deserve severe punishment. However, it is difficult to see, and Congress certainly did not intend, that one, but not the other, individual be treated as a recidivist.

Bright-line mechanistic devices have a place in the law. However, when Congress requires, as it clearly has here, that we distinguish between individuals committed to repetitive acts of violence and those who have not shown such a pattern in their lives, mechanistic tests may simplify the task, but they also make it a great deal less accurate. Here the court has chosen the easy approach that also, undoubtedly, will bring more individuals within the ambit of the statute. Our task, however, is not to stretch the statutory language, but to be responsive to the will of the Congress. The majority has chosen a course that will not fulfill that objective. Accordingly, I respectfully dissent.