UNITED STATES of America, Appellee,

v.

Lehman HOWARD, also known as Slim, Joseph Koontz, Defendants–Appellants.

UNITED STATES of America, Appellee,

v.

Rafael SANTANA, Defendant–Appellant.

Nos. 8, 9 and 45, Dockets 91–1534, 91–1630CON and 91–1631.

United States Court of Appeals, Second Circuit.

Argued Sept. 14, 1992.

Decided March 31, 1993.

Anthony E. Kaplan, Asst. U.S. Atty., New Haven, CT (Albert S. Dabrowski, U.S. Atty., D. Conn., of counsel), for appellee.

Shelley R. Sadin, Bridgeport, CT (David P. Atkins, Zeldes, Needle & Cooper, P.C., of counsel), for defendant-appellant Joseph Koontz.

John T. Walkley, Trumbull, CT, for defendant-appellant Lehman Howard.

Diane Polan, New Haven, CT (Williams & Wise, of counsel), for defendant-appellant Rafael Santana.

Before: MINER, ALTIMARI and WALKER, Circuit Judges.

WALKER, Circuit Judge:

Defendants-appellants Lehman Howard, Joseph Koontz and Rafael Santana were charged under a single indictment arising from their joint conspiracy to steal and later distribute a quantity of cocaine. Count one charged the three defendants with conspiring to violate 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(ii)(II) by possessing with intent to distribute five hundred grams or more of cocaine, in violation of 21 U.S.C. § 846. Count two charged the three defendants with attempting to violate 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(ii)(II) by possessing with intent to distribute five hundred grams or more of cocaine, in violation of 21 U.S.C. § 846. Count three charged the three defendants with using and carrying a firearm during and in relation to a narcotics trafficking offense, in violation of 18 U.S.C. §§ 924(c)(1) and 2. Count four charged Santana alone with being a convicted felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).

Howard and Koontz were tried in a joint jury trial in the United States District Court for the District of Connecticut before Judge T.F. Gilroy Daly. Howard was convicted on the first three counts of the indictment. Judge Daly sentenced Howard to two concurrent terms of 262 months imprisonment on counts one and two and to a consecutive term of 60 months on count three, for a total of 322 months. The court also ordered a five year supervised release term, and imposed a special assessment of $150. Howard appeals his sentence only, contending that: (1) he was improperly sentenced twice for the same conduct, (2) imposition of his drug and firearms sentences consecutively, rather than concurrently, violated his rights under the Double Jeopardy Clause of the Fifth Amendment of the Constitution, and (3) the firearms statute improperly was applied to him.

Koontz was convicted on the first two counts of the indictment and acquitted on the third. Judge Daly sentenced Koontz to concurrent terms of 121 months on the two counts. The court also ordered a supervised release term of five years, and imposed a special assessment of $100. Koontz also challenges his sentence only, contending that: (1) the district court improperly applied the narcotics provisions of the Federal Sentencing Guidelines (the "Guidelines") in determining his sentence, and (2) the district court improperly applied the offense level provisions of the Guidelines in determining his sentence.

Santana, who had given a statement that was inadmissible against his co-conspirators, was tried separately. The jury found him guilty on all four counts of the indictment. Judge Daly sentenced Santana to three concurrent terms of 290 months on counts one, two and four followed by a consecutive sentence of 60 months on count three, for a total of 350 months. The court also ordered a term of five years supervised release, and

**46**

imposed a special assessment of $200. Santana appeals from the judgment of conviction and his sentence, contending that: (1) the district court improperly denied him a hearing on his pre-trial motion to suppress evidence, (2) the district court incorrectly applied the armed career criminal statute, 18 U.S.C. § 924(e)(1), and (3) the guideline applicable to § 924(e)(1), U.S.S.G. § 4B1.4, does not comport with the intent of Congress, and was applied to him in violation of the Double Jeopardy Clause.

For the reasons given below, we affirm Santana's judgment of conviction and each defendant's sentence.

BACKGROUND

On December 27, 1990, Judge Daly authorized a wiretap upon the request of the Federal Bureau of Investigation ("FBI") and the New York City Police Department on a telephone in an apartment at 79 Alstrum Street in Hamden, Connecticut listed to Carol Webb, Santana's girlfriend. The purpose of the wiretap was to obtain evidence concerning the suspected involvement of Santana and others in a plan to commit murder. Through the wiretap, the government intercepted a number of incriminating conversations admitted into evidence at the trials of the defendants.

On the morning of January 2, 1991, Santana told Koontz on the telephone that he was "home trying to scheme on something." Koontz responded that he had learned that a Jamaican drug dealer in West Haven, Connecticut was "sittin[g] on" three kilograms of cocaine. Koontz also stated that one "Nate" knew the drug dealer's girlfriend, later identified as "Tutu," and that Tutu not only could tell Nate where the drug dealer lived, but also had a key to his apartment. Santana urged Koontz to "find that girl" and suggested that he and Koontz steal the cocaine.

Santana then called Howard and told him that there was "a hit for us." In later calls, Santana told Howard that he and Koontz were awaiting information about a Jamaican who had "three keys," and the two discussed obtaining weapons for the burglary.

On January 2, Koontz and Santana went over various plans for conducting the burglary, including one whereby they would use a copy of Tutu's key to gain access to the Jamaican drug dealer's apartment and feign a forced entry by breaking the lock. On January 5, after Koontz told Santana that he had obtained a copy of Tutu's key, Koontz expressed to Howard and Santana some doubts about whether the cocaine was in the apartment. Howard replied that the cocaine had "to be there." Santana also dismissed Koontz's doubts, stating: "we just go in and look. We find it, we got it, if it ain't, we out."

The defendants then agreed to go forward with the burglary that day following their earlier plan to use the key to gain entrance to the apartment, and then to make it look like a forced entry by damaging the lock and the windows. The three agreed that Santana would pick up Koontz at his house and that Santana would call Howard from there to let him know they were on their way to pick him up.

Aware of these intercepted conversations, FBI agents surveilled the Alstrum Street apartment on January 5. That afternoon, they saw Santana drive a red Nissan from his house to Koontz's apartment building on Mansfield Street in New Haven, Connecticut which he entered and later left with Koontz. The two then drove the car to Howard's residence on Highland Street in West Haven, Connecticut.

Agents subsequently followed the Nissan, now occupied by the three defendants, as it entered an apartment complex on Knox Street in West Haven, Connecticut. An agent then saw the car in a Knox Street parking lot, with Santana next to it and Koontz and Howard getting out of it. That agent radioed the Nissan's location to all involved and FBI and West Haven Police Department units converged on the scene.

Santana was stopped by West Haven Police officers and an FBI agent as he walked toward the entrance of 73 Knox Street, placed under arrest and searched. The officers found a loaded ammunition magazine in Santana's rear pocket and a nine-millimeter semi-automatic handgun in his front waistband. Later, the gun was test-fired and

found operable. Howard and Koontz, who had been following Santana, were also stopped, searched and arrested by FBI agents. The agents recovered a plastic bag containing a screwdriver and a pair of pliers from Howard, and a single key from Koontz. The key was separate from a set of keys located in Koontz's jacket. ·

The agents and officers attempted to use the key to enter apartment 108 at 73 Knox Street, but the key did not turn in the cylinder. The agents and officers knocked on the door and were permitted to search, but found no contraband. After unsuccessfully trying the key in the other apartments on the first floor of 73 Knox Street, the agents and officers went to a neighboring building, 105 Knox Street, where they tried the key in the door lock to apartment A–8. The key worked and, after their knocks went unanswered, the officers entered the apartment.[1]

In apartment A–8 at 105 Knox Street, the agents and officers found a woman with an infant, as well as a floor safe. Pursuant to a state search warrant, the agents and officers later searched the apartment and opened the safe, but found no narcotics.

On January 5, 1991, Santana gave a post-arrest statement to the West Haven Police Department and, on the following day, he gave a statement to the New York City Police Department and New York County District Attorney's Office. In these statements, Santana confirmed and corroborated the government's wiretap and surveillance evidence regarding the defendants' conspiracy and attempt to acquire cocaine. He stated that, after hearing from Koontz that the drug dealer was not in the apartment, he picked up Koontz and the two went to a location in New Haven and got the key to the apartment. They picked up Howard and all three proceeded to the apartment complex in West Haven where they believed the cocaine was located. Although he was uncertain as to which building the cocaine was in, Koontz knew that the drugs were in apartment A–8. Santana stated that he intended to load the

gun he was carrying in his waistband if the drug dealer was in the apartment, and that Howard planned to use his screwdriver to break the apartment's lock in order to make the crime look like a forced burglary.

Following the return of the indictment in this case on February 13, 1991, the district court severed the trial of Howard and Koontz from Santana's as required by *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), since the post-arrest statements of Santana, incriminating Koontz and Howard, were only admissible against Santana. Howard and Koontz were convicted on June 20, 1991. Santana was convicted on July 25, 1991.

## DISCUSSION

### I. *Howard*

On counts one and two, Howard was awarded a Guidelines base offense level of 28, and his prior convictions made him eligible for a criminal history category of VI. It is undisputed that, due to his age, prior criminal convictions and the nature of the instant offenses, Howard properly was defined as a "career offender" under § 4B1.1 of the Guidelines, subjecting him to an enhanced sentence. Because he was convicted of a crime with a statutory maximum prison term of 25 years or more, § 4B1.1 directed that Howard's Guidelines offense level be increased to 34, while his criminal history category remained unchanged. The sentencing range for offense level 34 and criminal history category VI is from 262 to 327 months. As noted above, the district court sentenced Howard to two concurrent terms of 262 months on the first two counts, in addition to a mandatory consecutive 60 month term on count three for violation of 18 U.S.C. §§ 924(c)(1) and 2.

Howard argues that his sentence was calculated through improper double counting and violated the Double Jeopardy Clause of the Fifth Amendment. Howard also con-

---

1. The record on appeal does not contain an explanation of why the officers and agents first selected apartment 108 at 73 Knox Street. A West Haven police report attached to a motion to suppress evidence brought by Santana states that

an officer had learned from a confidential informant that a drug dealer was conducting business in apartment A–8 at 105 Knox Street, thus explaining the officers' and agents' decision to search that apartment.

tends that § 924(c)(1) was improperly applied to him. These claims are without merit.

### A. Double Counting

Howard contends that the same criminal acts that categorized him as a career offender under the Guidelines, and thus contributed to his 262 month sentence on counts one and two, were taken into account in arriving at his additional, consecutive 60 month sentence on count three. There is no absolute prohibition against using the same conduct for more than one adjustment of a defendant's sentence under the Guidelines. *See United States v. Patterson*, 947 F.2d 635, 637 (2d Cir.1991); *cf. United States v. Blakney*, 941 F.2d 114, 117–18 (2d Cir.1991) (prior conviction may be used to determine offense level and criminal history category). However, such "double counting" is not permitted where it is contrary to the intent of the Sentencing Commission. *See Patterson*, 947 F.2d at 637.

An Application Note to the guideline applicable to violations of § 924(c)(1) indicates that the Sentencing Commission generally disapproves of double counting through enhancement of a defendant's sentence for his underlying offense due to "any specific offense characteristic for the possession, use, or discharge of a firearm...." U.S.S.G. § 2K2.4, Application Note 2. Acting in accordance with the intent of the Sentencing Commission, the district court did not award Howard a two point enhancement upon his base offense level for possession of a firearm during the commission of his drug offenses. *See* U.S.S.G. § 2D1.1(b)(1). And, while Howard's use of a gun during the commission of the underlying drug crimes formed the basis of his conviction and sentence on count three for violation of § 924(c)(1), the use of the gun was not a factor in the district court's classification of Howard as a career offender. Because the district court considered Howard's use of the gun only in connection with his count three sentence under § 924(c)(1), his double counting argument fails.

### B. Double Jeopardy

Howard's Double Jeopardy claim also is without merit. In the sentencing context, the Double Jeopardy Clause ensures that "sentencing courts do not exceed, by the device of multiple punishments, the limits prescribed by the legislative branch of government, in which lies the substantive power to define crimes and prescribe punishments." *Jones v. Thomas*, 491 U.S. 376, 381, 109 S.Ct. 2522, 2525, 105 L.Ed.2d 322 (1989); *see Ohio v. Johnson*, 467 U.S. 493, 499, 104 S.Ct. 2536, 2540, 81 L.Ed.2d 425 (1984). The Clause thus prohibits courts from imposing multiple punishments for the same offense in excess of the total punishment authorized by the legislature. *United States v. Halper*, 490 U.S. 435, 450–51, 109 S.Ct. 1892, 1902–03, 104 L.Ed.2d 487 (1989). Howard contends that the Congress did not authorize the imposition of a cumulative mandatory sentence for violation of § 924(c)(1) upon persons sentenced as career offenders under the Guidelines.

The imposition of Howard's 60 month sentence for violating § 924(c)(1) consecutive to his sentences for the underlying drug crimes was not simply authorized by Congress; it was mandated. Section 924(c)(1) "provides that notwithstanding any other provision of law, the court shall not suspend the sentence imposed for violations of this subsection; 'nor shall the term of imprisonment imposed under this subsection run concurrently with any other term of imprisonment....'" *United States v. Lawrence*, 928 F.2d 36, 38 (2d Cir.1991) (quoting 18 U.S.C. § 924(c)(1)). Thus, on its face, the statute mandates imposition of a sentence that may neither be suspended nor overlap with any other sentence imposed by the court. Moreover, as we noted in *Lawrence*, the legislative history preceding the 1984 amendment of § 924(c)(1) explicitly articulates Congress' intent to ensure that sentences for violations of § 924(c)(1) do not overlap with any other punishments. *See Lawrence*, 928 F.2d at 38–39; S.Rep. No. 225 ("S.Rep."), 98th Cong., 2d Sess. 313, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3491. The 1984 amendment was directed at avoiding the result of *Busic v. United States*, 446 U.S. 398, 100 S.Ct. 1747, 64 L.Ed.2d 381 (1980), which held that penalties imposed under the previous version of § 924(c)(1) could not be

imposed consecutively to the penalties imposed under other statutes containing their own penalty enhancement provisions. *See* S.Rep. at 312–13, *reprinted in* 1984 U.S.C.C.A.N. at 3490–91.

In promulgating the career offender guideline, the Sentencing Commission incorporated Congress' definition of a career offender. *Compare* 28 U.S.C. § 994(h)(1)–(2) *with* U.S.S.G. § 4B1.1. The career offender guideline responds to Congress' determination that such offenders should receive sentences of imprisonment "at or near the maximum term[s] authorized" by their statutes of conviction. 28 U.S.C. § 994(h). We have no reason to believe that Congress wished to except career offenders, whom they intended to subject to enhanced punishments, from the general rule against overlapping sentences for violations of § 924(c)(1) and underlying offenses.

Given that Congress clearly intended to impose cumulative punishments upon defendants like Howard, and that his sentences were fully authorized by the relevant statutes, the Double Jeopardy Clause has not been violated. *See, e.g., Missouri v. Hunter,* 459 U.S. 359, 368–69, 103 S.Ct. 673, 679, 74 L.Ed.2d 535 (1983) (where "a legislature specifically authorizes cumulative punishment under two statutes ... a court's task of statutory construction is at an end"); *Lawrence,* 928 F.2d at 39 (same).

### C. *Application of § 924(c)(1)*

■ Finally, Howard argues that he was improperly sentenced to a 60 month consecutive sentence under § 924(c)(1), which provides in relevant part:

> Whoever, during and in relation to any crime of violence or drug trafficking crime ... uses or carries a firearm, shall, in addition to the punishment for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years....

18 U.S.C. § 924(c)(1).

Howard reasons that he was "not sentenced to imprisonment for a crime of violence or a drug trafficking crime," but, rather, was sentenced under the schedule of penalties provided by the career offender guideline. Yet, Howard was not convicted or punished for the "crime" of being a career offender. Howard was convicted of, and sentenced for, the underlying drug offenses set forth in counts one and two of the indictment, and those offenses provided the predicate for imposition of the prison sentence required by § 924(c)(1). The career offender guideline served only to set forth the parameters applied by the district court in determining Howard's sentence for his drug offenses.

## II. *Koontz*

Koontz offers two primary challenges to his sentence. First, he contends that he improperly was sentenced under the narcotics guidelines. Second, he contends that the district court improperly determined his sentence on counts one and two by attributing three kilograms of cocaine to him, on the ground that he was not reasonably capable of producing such a quantity of narcotics. Both contentions are without merit.

On counts one and two, Koontz's Guidelines base offense level was 28, which was enhanced by two points to 30 due to his use of a weapon during the commission of the drug offenses. He was assigned criminal history category III. The sentencing range for offense level 30 and criminal history category III is from 121 to 151 months. As noted above, the district court sentenced Koontz to two concurrent terms of 121 months on counts one and two.

### A. *Application of the Narcotics Guidelines*

Despite the fact that he was convicted of conspiracy and attempt to possess narcotics, Koontz argues that he was improperly sentenced under the narcotics guidelines. Although his argument is somewhat opaque, Koontz apparently believes that, because his and his co-conspirators' criminal activity did not involve a typical drug transaction, the narcotics guidelines are inapplicable to his case as a matter of law.

■ The record does not disclose that Koontz objected to the application of the narcotics guidelines in the court below.

Thus, he probably has waived his right to do so on appeal. *See United States v. Rodriguez,* 943 F.2d 215, 217 (2d Cir.1991) (court "will be hesitant to consider on appeal sentencing issues not raised in the district court"). In any event, his argument is without merit. To be sure, Koontz's crimes did not involve a typical narcotics transaction. Instead of selling or purchasing drugs, he and his co-conspirators planned to steal them. Thus, Howard could likely have been indicted for attempted larceny as well as the drug offenses he was charged with. However, Koontz properly was convicted of conspiracy and attempt to possess and distribute cocaine; thus, he was properly sentenced under the guidelines applicable to those offenses. *See, e.g., Schetz v. United States,* 901 F.2d 85, 86 (7th Cir.1990) (defendant convicted of conspiracy to possess and distribute cocaine through theft of car he believed to contain drugs properly sentenced under narcotics guidelines).

■ Koontz also argues that he and his co-conspirators were incompetent and unlikely to succeed in their robbery plan, even absent government intervention. Koontz apparently believes that the "bungling burglar" scenario presented by his case constitutes a mitigating circumstance that is not within the "heartland" of factual scenarios considered by the Sentencing Commission in formulating the Guidelines. A mitigating circumstance not considered by the Sentencing Commission may entitle a defendant to a downward departure from a Guidelines sentence. See U.S.S.G. § 5K2.0. Yet Koontz failed to argue this allegedly mitigating circumstance as a basis for departure before the district court. He may not do so for the first time on appeal. *See United States v. Khan,* 920 F.2d 1100, 1107 (2d Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 1606, 113 L.Ed.2d 669 (1991).

B. *Calculation of Offense Level*

Koontz next challenges the applicability of guideline § 2D1.1(c)(8), which mandates that defendants convicted of crimes involving possession with intent to sell "[a]t least 2 KG but less than 3.5 KG of Cocaine" be assigned a base offense level of 28. The court applied § 2D1.1(c)(8) to the conspiracy and attempt charged here because former § 2D1.4(a) of the Guidelines provides that "[i]f a defendant is convicted of a conspiracy or an attempt to commit any offense involving a controlled substance, the offense level shall be the same as if the object of the conspiracy or attempt had been completed." U.S.S.G.App. C, amend. no. 447. After Koontz was sentenced, former § 2D1.4 was deleted by the Sentencing Commission and effectively incorporated into the guidelines applicable to certain substantive narcotics offenses, including § 2D1.1. *See, e.g.,* U.S.S.G. § 2D1.1 (applicable to attempts and conspiracies to commit certain drug offenses, including violations of 21 U.S.C. § 841(b)(1)(B)).

Koontz contends that he lacked the intent and capability to produce three kilograms of cocaine, and thus that § 2D1.1(c)(8) should not have been applied to him. He relies upon Application Note 1 to former § 2D1.4, which provides in relevant part that:

> where the court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount [of the controlled substance], the court shall exclude from the guideline calculation the amount that it finds the defendant did not intend to produce and was not reasonably capable of producing.

U.S.S.G.App. C, amend. no. 447; *see* U.S.S.G. § 2D1.1, Application Note 12.

The drafters of the Application Note had in mind negotiations for the sale of narcotics, and thus the Note is not directly relevant to defendants' conspiracy and attempt to steal narcotics. *See United States v. Adames,* 901 F.2d 11, 12 (2d Cir.1990) (applying earlier version of Application Note; sentence "refers to a specific situation in which the defendant is a seller of drugs," although broader language of Application Note may be applied to buyers).

Even accepting that the reasoning of the Application Note is applicable by analogy to this case, Koontz's theory fails. The Application Note states that a given quantity of narcotics will not be charged to a defendant if the defendant both was not reasonably

capable of producing and did not intend to produce the amount of narcotics at issue. *See United States v. Brooks,* 957 F.2d 1138, 1151 (4th Cir.) (Application Note requires showing of both lack of intent and lack of reasonable capability), *cert. denied,* —— U.S. ——, 112 S.Ct. 3051, 120 L.Ed.2d 917 (1992).

 The district court found that Koontz intended to steal three kilograms of cocaine. We review a district court's findings of fact in sentencing only for clear error, *see United States v. Olvera,* 954 F.2d 788, 791 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 3011, 120 L.Ed.2d 885 (1992); *United States v. Jacobo,* 934 F.2d 411, 418 (2d Cir. 1991), and here there was no error at all. The jury found that Koontz planned to surreptitiously enter a drug dealer's apartment to steal what might amount to three kilograms of cocaine. To be sure, Koontz expressed doubts as to whether the drugs were in the apartment and, at one point, even suggested that he and his co-conspirators call off the plan. Yet, despite these doubts, Koontz and his co-conspirators went forward with their attempt to steal the drugs. Any misgivings Koontz may have had about the eventual success of the criminal venture do not bear upon the quantity of drugs the conspirators hoped to acquire through their burglary. Therefore, such professed doubts do not provide Koontz with a basis for challenging his sentence under the rationale of the Application Note. *See, e.g., United States v. Palmer,* 761 F.Supp. 697, 705 (D.Idaho 1991) (rejecting challenge based upon physical inability to produce negotiated amount of narcotics where court did "not question the defendant's intent to produce" the drugs), *aff'd,* 988 F.2d 124 (9th Cir.1993).

 Although we need not reach the issue, Koontz also incorrectly contends that Koontz and his co-conspirators were not "reasonably capable" of producing three kilograms of cocaine within the meaning of the Application Note. Koontz contends that there was no cocaine in the apartment before the defendants attempted to rob it. Thus, he argues, it would have been impossible for Koontz, Howard and Santana to carry out their criminal plan successfully. Yet, the Application Note does not imply that the

Guidelines provide a defense of impossibility that is unavailable under the substantive laws of attempt and conspiracy. As the government notes, to do so would effectively preclude buyers in "reverse stings," who unknowingly enter into sham drug deals with undercover agents, from being sentenced under the narcotics guidelines. *See Adames,* 901 F.2d at 12 (upholding imposition of narcotics guideline sentence upon purchaser who received placebo in reverse sting). Rather, the "reasonably capable" language of the Application Note looks to whether a defendant would have been able to consummate a narcotics transaction if the facts were as he believed them to be. *See United States v. Caba,* 955 F.2d 182, 187 (2d Cir.) (issue is whether defendant had the means necessary—financial or otherwise—to "go[ ] through with the deal"), *cert. denied,* —— U.S. ——, 113 S.Ct. 130, 121 L.Ed.2d 84 (1992). Koontz and his co-conspirators clearly had the means to carry out their conspiracy on the facts as they understood them to be. They not only had developed a plan to rob the Jamaican drug dealer, but had obtained a key and tools necessary to carry it out. The tools included the gun carried by Santana that could be used to rob the drug dealer if that proved necessary.

Because we have rejected Koontz's arguments in opposition to his Guidelines sentence, we need not reach his final contention, that he was improperly sentenced as a second offender under 21 U.S.C. § 851, which mandates a minimum sentence of 10 years imprisonment. *See* 21 U.S.C. § 841(b)(1)(B)(ii)(II). Koontz's properly determined Guidelines sentence exceeded 10 years by one month.

### III. *Santana*

#### A. *Motion to Suppress*

Santana challenges his conviction on the ground that the district court improperly denied consideration of his pre-trial motion to suppress evidence based upon a detention and seizure for which he says the police officers and FBI agents lacked probable cause.

Santana's motion in the district court was untimely. The district court granted three extensions of time to file pre-trial motions prior to the final motion date set by the court, April 26, 1991. On that date, Santana filed nine motions, including motions to suppress certain evidence. Thirty-nine days later Santana filed the motion at issue, along with a motion to file out of time. The district court denied both motions without a hearing.

 Federal Rules of Criminal Procedure 12(b)(3) and 12(c) require the filing of all motions to suppress by the date set by the court. The failure to file a timely motion constitutes a waiver, see Fed.R.Crim.P. 12(f); however, a district court may grant relief from the waiver upon a showing of: (1) cause for the defendant's non-compliance, and (2) actual prejudice arising from the waiver. *See United States v. Hamm*, 786 F.2d 804, 806–07 (7th Cir.1986); 1 C. Wright, Federal Practice and Procedure (Criminal) § 193, at 698 n. 24 (2d ed. 1982) (citing *Wainwright v. Sykes*, 433 U.S. 72, 84, 97 S.Ct. 2497, 2505, 53 L.Ed.2d 594 (1977)). We review a district court's denial of a Rule 12(f) motion only for clear legal error, *see United States v. Wertz*, 625 F.2d 1128, 1132 (4th Cir.), *cert. denied*, 449 U.S. 904, 101 S.Ct. 278, 66 L.Ed.2d 136 (1980), or an abuse of discretion, *see United States v. Leal*, 831 F.2d 7, 10 (1st Cir.1987).

 Santana failed to make the threshold showing of good cause for his failure to make a timely motion. Santana's counsel contends that she did not learn "of all of the circumstances surrounding defendant's arrest until a lengthy meeting with Mr. Santana [in] jail in late May, 1991." Counsel filed her motion two and one-half months after the district court gave its first extension and nearly five months after Santana was arrested. Yet, counsel offers no reason for her failure to discuss with her client the circumstances of his arrest before the court's April 26 deadline. Absent a demonstration of cause, we need not address the merits of Santana's fourth amendment argument. *See United States v. Ulloa*, 882 F.2d 41, 43 (2d Cir.1989).

**B.** *Sentencing Challenges*

On counts one, two and four, Santana was awarded a Guidelines base offense level of 28, and his prior convictions made him eligible for a criminal history category of IV. Because he had previously been convicted of three violent and/or drug-related crimes, including one conviction for attempted burglary and two convictions for armed robbery, Santana was classified as an armed career criminal within the meaning of 18 U.S.C. § 922(g)(1). Thus, Santana's sentence was enhanced under guideline § 4B1.4, which applies to § 924(e)(1). Pursuant to § 4B1.4, Santana's offense level was increased to 34, and he was placed in criminal history category VI, making him eligible for a sentence of between 262 and 327 months. As noted above, Santana received three concurrent sentences of 290 months on counts one, two and four, in addition to a mandatory 60 month consecutive sentence for his conviction on count three for violation of 18 U.S.C. §§ 924(c)(1) and 2.

 Santana argues that the district court improperly classified him as an armed career criminal under § 924(e)(1). He also contends that § 4B1.4 is in conflict with the legislative intent of Congress in promulgating the Guidelines and was applied to him in violation of the Double Jeopardy Clause. However, we need not address these arguments to uphold Santana's sentence because he would have received the same offense level and criminal history category if § 4B1.4 had not been applied to him.

Santana, like Koontz, qualifies as a career offender under § 4B1.1; he: (1) was 18 years old at the time he committed the instant offenses, (2) was convicted of a controlled substance offense, and (3) has two prior violent crime convictions. *See* U.S.S.G. § 4B1.1. And, under § 4B1.1, Santana would have received offense level 34 and criminal history category VI, the same Guidelines range he received under § 4B1.4. *See id.* ("career offender's criminal history category in every case shall be Category VI"; career offender receives offense level 34 where statutory maximum term for instant offense is 25 years or more and less than life imprisonment).

We also need not reach Santana's remaining challenge to his sentence, by which he purports to adopt Koontz's argument that the district court misapplied the narcotics guidelines. Because Santana was sentenced under the armed career criminal guideline and could properly have been sentenced under the career offender guideline, this argument is irrelevant.

## CONCLUSION

For the foregoing reasons, the district court's judgments are affirmed.