**UNITED STATES of America, Appellee,**

v.

**Derrick FORRESTER, Defendant–Appellant.**

**No. 1025, Docket 93–1824.**

United States Court of Appeals, Second Circuit.

Argued March 17, 1995.

Decided June 29, 1995.

**56**

Theodore B. Heinrich, Asst. U.S. Atty. for the D.Conn., Bridgeport, CT (Christopher F. Droney, U.S. Atty. for the D.Conn., New Haven, CT, on the brief), for appellee.

Michael Young, New York City, for defendant-appellant.

Before OAKES, CARDAMONE and ALTIMARI, Circuit Judges.

ALTIMARI, Circuit Judge:

Defendant-appellant Derrick Forrester ("Forrester") appeals from a judgment of conviction entered in the United States District Court for the District of Connecticut (Cabranes, *J.*), following trial to a jury. Principally upon the testimony of three cooperating conspirators and two government agents, Forrester was convicted of conspiracy to distribute and export cocaine and distribution of cocaine in violation of 21 U.S.C. §§ 963, 846, and 841(a)(1). Although indicted in 1989, Forrester was not arrested and tried until 1993. He appeals the district court's denial, on both procedural and substantive grounds, of his post-trial motion for dismissal alleging the breach of his constitutional right to a speedy trial. He also argues that the district court made several evidentiary errors. We (1) affirm the district court's rejection of Forrester's speedy trial motion, and (2) reverse and remand for a new trial, principally as a consequence of evidentiary errors that collectively deprived Forrester of a fair trial. Accordingly, we do not decide the sentencing issue raised by Forrester.

## Background

*Summary*

According to the government's theory, Forrester was "Sam," one of two ringleaders of a cocaine smuggling conspiracy. Along with a partner called "Tony," who was never identified, Forrester was alleged to have directed smuggling by three young women from Connecticut who were used as couriers: Jerilyn "Jay" DeLuco ("DeLuco") was alleged to have recruited Paula Bagley ("Bagley") who, in turn, enlisted Pamela Golemba ("Golemba"). The scheme required the women to fly to London wearing baggy clothing to conceal several packages of cocaine strapped to their bodies. Forrester, along with "Tony," allegedly provided the drugs, helped the couriers obtain passports in Connecticut, paid for them to stay in a New York hotel, bought their loose-fitting clothing, and assisted in taping the bundles to the women's bodies. All three women pleaded guilty and testified at trial in exchange for reduced sentences. Another female courier and her male contact were arrested in London.

Forrester's defense was that "Sam" did not exist. He argued that the three couriers had fabricated the story after realizing the benefit they could derive from incriminating a higher-up. Forrester's version of the facts was fortified by the investigating agent's notes which, although written immediately following interviews with each of the three female couriers, made no mention of "Sam." The details of the scheme, which we describe in some detail, were as follows.

*The Incident at the Ramada Inn*

Following a phone call from then seventeen year old Doris Rodriguez ("Rodriguez" or "declarant"), the Stamford, Connecticut police began a stake-out of a hotel room at the Stamford Ramada Inn on February 3, 1989. A woman, later identified as co-conspirator DeLuco, was observed leaving the Stamford Passport Office and entering the hotel room. Agents of the Drug Enforcement Agency ("DEA"), whose assistance had been solicited by the police, followed and pretended to arrest Rodriguez in the hotel room on the ground that she was a runaway. Present in the hotel room were DeLuco and Forrester. No drugs or drug paraphernalia were found in the room. Away from the other two, Rodriguez surrendered roundtrip airline tickets from New York City to London, for herself and DeLuco. Although Rod-

riguez did not testify at trial, statements attributed to her were admitted over hearsay objections by the defense, for the alleged purpose of establishing that her encounter at the Ramada Inn with DeLuco and Forrester was "narcotics-related."

### Seymour's Investigation

Almost three weeks later, DEA Special Agent Dale Seymour ("Seymour"), who had been present at the Ramada Inn on February 3rd, learned that a neighbor of DeLuco's, Darlene King ("King"), had obtained a duplicate passport and had a reservation to fly from New York to London on February 24, 1989. Seymour watched King depart from John F. Kennedy Airport. He testified that she wore loosely fitting clothes and that her departure was intently observed by a black female and a black male. After King's arrest by London authorities, a search revealed that she carried 1.99 kilograms of cocaine in packages secured to her person by a girdle. Her London contact was also arrested at that time.

On February 27, 1989, the authorities executed search warrants for three residences: King's, DeLuco's and a home on Durham Street, the address on Forrester's driver's license. A search of the Durham Street home revealed a kitchen calendar with several phone numbers scribbled on it. One was an international number with London's city prefix, next to which was written "Damon," the name of King's London contact.

Subsequently, Seymour sought to locate DeLuco. He learned from the Stamford Passport Office that Bagley had applied for a duplicate passport in the company of DeLuco. Bagley's passport application listed Golemba as her friend. Bagley, DeLuco and Golemba were all eventually arrested and charged in the same conspiracy. Each identified Forrester, both in court and on the basis of a prior photospread identification, as one of two leaders, known to them as "Sam." All three women testified against Forrester at trial in exchange for reduced sentences.

### The Courier Interviews

The testimony of the three couriers was substantially similar. We summarize the details of the scheme as recounted by Bagley at trial. Bagley testified that, in addition to DeLuco, she knew that two men, "Sam" and "Tony," were involved in the scheme. "Tony" explained the scheme to the three women at a restaurant in Enfield, Connecticut. Although "Sam" was present, he said little. "Tony" drove Bagley and DeLuco to Stamford so that Bagley could get a passport, and paid for their hotel stay. Then "Sam" drove Bagley to New York where she registered at a hotel for which "Sam" paid. The next night "Tony" took Golemba to the hotel. At some point while they were at the New York hotel, the ringleaders either paid the couriers half of the money they had been promised, or were present when the women were paid by someone else. Both men accompanied the women to a department store to shop for loose-fitting clothing, for which the men paid.

Bagley and Golemba by then held airline tickets purchased by "Tony." In an effort at subterfuge, they exchanged the tickets they held to a Caribbean destination for tickets to London. Shortly before Bagley's flight, "Tony" took her to a different hotel, where he was staying. Accompanied by an unidentified woman, "Sam" brought six packages of cocaine to the room. The woman and "Sam" taped the packages to Bagley before "Tony" took her to catch a flight to London. Bagley passed through Customs without being searched and checked into a London hotel room where "Tony" and "Sam" had secured a reservation in her name. Bagley delivered the drugs without incident. Golemba, who had arrived on a different flight, also met with no difficulty. The two couriers stayed in London for a few days. Upon their return to the United States, Bagley never again saw either "Tony" or "Sam." About a week after Bagley and Golemba returned, Bagley was contacted by agent Seymour. Around the same time, Bagley learned from DeLuco's mother that a warrant had issued for DeLuco's arrest.

On March 1, 1989, Seymour went to Bagley's workplace and interviewed her about the conspiracy. According to Bagley, she related the entire story to him at that time. She testified that she told the agent (1) about the meeting in the Enfield restaurant attend-

ed, among others, by "Sam"; (2) that "Sam" drove her to the New York hotel; (3) that he and a woman helped tape the drugs on her body before her flight; (4) that "Tony" and "Sam" were both present when she and Golemba were paid; and (5) that "Sam" took her shopping for suitable travel clothes.

DeLuco, who testified first, provided the same information. She also testified that some two weeks after she made a successful smuggling trip to London, organized, as described above, by "Sam" and "Tony," she was at the Stamford Ramada Inn with Rodriguez and Forrester waiting for passports when agents removed the teenager. A few weeks later, she recruited Bagley and Golemba and attended the meeting in Enfield. In late February DeLuco made a test run to London, carrying no drugs, and was searched, a fact she reported to one of the two ringleaders. Shortly thereafter, "Tony" told her that her courier-neighbor, King, had been arrested. DeLuco fled to Missouri but eventually turned herself in to Seymour. Seymour interviewed her on March 2, 1989 at which point she described the entire scheme to him, including a full explanation of the roles of "Sam" and "Tony."

Golemba's trial testimony was to the same effect as that of Bagley. Like Bagley, she, too, was interviewed by Seymour on March 1, 1989. On cross-examination, Golemba testified that she had recounted the important details of the scheme to the agent, including information about "Sam" and "Tony." She also said that she had, during the interview, picked "Sam"'s photograph from several shown to her by Seymour.

Despite the testimony of the three couriers that "Sam" and "Tony" were not only the smuggling scheme's alleged ringleaders but handled virtually all of its particulars, and the testimony of all three women that they had shared with the DEA agent on March 1 and 2, 1989 the details of the ringleaders' participation, none of Seymour's three written reports contained any reference to "Sam" or "Tony." Further, the agent's report made no reference to Golemba's purported photo-identification of Forrester during the agent's interview with her. Finally, DeLuco admitted that the only reason she could identify

Forrester at trial was his presence "in the defendant's chair."

### The Speedy Trial Claim

Although the criminal activities, investigation and indictment all occurred in 1989, Forrester was not arrested until 1993. The government asserts that Forrester was a "fugitive" for the more than three years that elapsed. The defendant contends, however, that (1) he did not know he was being sought; (2) he lived and worked openly in his own name in both New York City and Colorado, where he was eventually arrested; and (3) he frequently travelled to Hartford to visit his parents and to conduct a business which he operated in his own name there.

Forrester's trial counsel made no speedy trial motion before trial commenced. Additional counsel, hired on the eve of trial, advised the court that, in the event of a conviction, defendant would assert his constitutional right to a speedy trial. When Forrester did so, by written motion, the court, after oral argument, denied the motion as untimely and determined that it also failed to raise a substantial claim.

On appeal, Forrester makes the following arguments: (1) the district court should have granted the speedy trial motion; (2) the district court erred in allowing agent Seymour and a Stamford police officer to testify that Rodriguez told (a) the officer that the encounter at the Ramada Inn was "narcotics-related"; and (b) Seymour that, among other things, Forrester gave her the plane tickets and was to provide her with the cocaine; (3) the court erred in allowing Seymour to testify that (a) Golemba's trial testimony was "consistent" with a pretrial statement she had given to the agent; and (b) in his opinion, Golemba had not made things up while testifying; and (4) the government should not have been allowed to use a prior consistent statement of Bagley which, Forrester alleges, was made *after* she gained a motive to fabricate.

### Discussion

### I. Speedy Trial Claim

Forrester claims that the court erred in denying his motion for dismissal on

the Sixth Amendment ground that the government was negligent in pursuing the action against him. Forrester's motion, however, was filed out of time. *See* Fed.R.Crim.P. 12(b)(1) (defenses based on defects in the commencement of prosecution must be raised before trial). A district court may, in its discretion, relieve a defendant of the constitutional waiver effected by failure to timely file where the defendant has established: (1) cause for the non-compliance; and (2) actual prejudice. *See United States v. Howard,* 998 F.2d 42, 52 (2d Cir.1993); Fed.R.Crim.P. 12(f). We review for an abuse of discretion the court's decision not to forgive Forrester's delinquency. *See Howard,* 998 F.2d at 52 (review of denial of Rule 12(f) motion is for abuse of discretion or clear legal error).

■■■ Forrester has failed to demonstrate good cause for his tardiness. He lays the blame at the door of trial counsel whose competence he says he questioned. Inadvertence by counsel, however, does not constitute cause. *See, e.g., Indiviglio v. United States,* 612 F.2d 624, 631 (2d Cir.1979) (counsel's failure to make suppression motion before trial constituted waiver whether omission resulted from inadvertence or strategy), *cert. denied,* 445 U.S. 933, 100 S.Ct. 1326, 63 L.Ed.2d 768 (1980). Further, it makes no difference whether the claim of attorney oversight is raised on direct appeal, or collateral attack. *See id.* (citing *Davis v. United States,* 411 U.S. 233, 242, 93 S.Ct. 1577, 1582–83, 36 L.Ed.2d 216 (1973)). Forrester demonstrated no cause for his non-compliance, thus we need not address the merits of his speedy trial motion. *See, e.g., Howard,* 998 F.2d at 52.

■■■ Even if we were to address the substance of that motion, however, we would conclude that the district court did not abuse its discretion in denying it. A speedy trial motion requires the evaluation of four factors: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant. *See Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 2191–92, 33 L.Ed.2d 101 (1972). In examining the likely merits of the claim, the trial court concluded that only the first factor (the 47 month delay)

weighed in the defendant's favor. The court determined that three of the *Wingo* factors weighed against Forrester: (1) the government was not negligent; (2) the likelihood was that Forrester knew he was wanted in connection with the smuggling; and (3) Forrester had failed to establish actual prejudice as a result of the government's delay. These findings, detailed in the district court's written opinion, *see United States v. Forrester,* 837 F.Supp. 43, 45–47 (D.Conn.1993), were not clearly erroneous. Accordingly, it was not an abuse of discretion to deny the motion on the ground that it was untimely filed.

## II. Trial Court's Evidentiary Rulings

■■■ A trial court's evidentiary rulings are disturbed when "manifestly erroneous." *Proteus Books Ltd. v. Cherry Lane Music Co.,* 873 F.2d 502, 514 (2d Cir.1989). On the other hand, an application of the rules concerning hearsay is reviewed for the abuse of discretion. *See, e.g., United States v. Orena,* 32 F.3d 704, 712 (2d Cir.1994); *United States v. Tracy,* 12 F.3d 1186, 1201 (2d Cir.1993); *Malek v. Federal Ins. Co.,* 994 F.2d 49, 53 (2d Cir.1993).

### A. Declarations of Doris Rodriguez

■■■ "Hearsay is evidence of a declarant's out-of-court statement to prove the truth of what is asserted in the statement," *United States v. Reyes,* 18 F.3d 65, 69 (2d Cir.1994); *see also* Fed.R.Evid. 801, "the principal vice" of which is that it deprives the opponent of the opportunity to cross-examine the declarant, *see Reyes,* 18 F.3d at 69. Nonetheless, the government may be permitted to offer an out-of-court statement for the purpose of showing an investigating agent's state of mind in order to help a jury understand the agent's subsequent actions. *Id.* at 70. Such evidence may be admitted to rebut "initiatives launched by the defendant." *Id.* The government's identification of a relevant non-hearsay use for such evidence, however, is "insufficient to justify its admission if the jury is likely to consider the statement for the truth of what was stated with significant resultant prejudice." *Id.* Forrester challenges the admission of two statements made

by Rodriguez and conveyed to the jury through the testimony of government agents.

### 1. Statement That Investigation was "Narcotics–Related"

 The government's first witness was Stamford police sergeant Richard Colwell ("Colwell"), who had responded to Rodriguez's phone call alerting the authorities to activity at the Ramada Inn. Colwell was called to testify to the activities of February 3, 1989. When asked by the government on direct examination whether he had been involved in a "narcotics-related incident" on that date at the hotel, Colwell responded affirmatively. The government believed it necessary that the jury understand that officers had gone to the Ramada Inn in response to Rodriguez's plea for assistance. Reluctant, however, to put a witness on the stand who was seventeen at the time of the contested events, the government asked Colwell to tell the jury what Rodriguez wanted when she asked for help. The government withdrew the question after the defense objected on the ground that the testimony would constitute hearsay.

In pursuing its argument that the Ramada Inn incident involved prostitution, not drugs, the defense asked Colwell on cross-examination whether he had previously testified that the investigation was "narcotics-related." When the sergeant affirmed his earlier answer, the defense established that he held his view despite the scene he confronted: two casually-dressed women were present in a hotel room with one man, they were cooperative and produced identification, no search of the room was conducted, and no narcotics were found. On re-direct examination, the prosecution asked Colwell the basis for his conclusion that the incident at the Ramada Inn involved narcotics. Over objection, Colwell was permitted to tell the jury that information provided by Rodriguez led him to believe that the investigation involved drugs. The government reasons that this testimony was permissible because, having "attacked" Colwell's conclusion about the nature of the happening at the Ramada, the defense "opened the door" to Colwell's counter-explanation.

We are not persuaded. It seems clear that the government was attempting to establish the truth of Rodriguez's assertion. Indeed, in this case, the government created the very predicament in which it found itself by asking Colwell whether he had been involved in a "narcotics-related" incident at the Ramada Inn. Further, the government cannot assert that Colwell's state of mind was relevant to the determination of any material fact. *See Reyes*, 18 F.3d at 70 (court must determine whether the asserted non-hearsay purpose of the evidence "is relevant, *i.e.*, whether it supports or diminishes the likelihood of any fact 'that is of consequence to the determination of the action'" (quoting Fed.R.Evid. 401)). Colwell's concept of the nature of the investigation was not relevant to "any fact 'that is of consequence to the determination of the action.'" *See id.* (quoting Fed.R.Evid. 401). Nor can Forrester's defense—that he was at the hotel for purposes of prostitution—be considered a "tactic that justifiably open[ed] the door to such evidence to avoid prejudice to the Government." *See id.* at 70.

In asserting the admissibility of the testimony, the government relies on cases in which the defense had invited the use of hearsay in order to counter a suggestion of wrongdoing on the part of the investigators. *See United States v. Pulley*, 922 F.2d 1283, 1287 (6th Cir.) (where defense suggested that government planted incriminating evidence, government was entitled to explain its persistence with respect to protracted investigation that initially proved fruitless), *cert. denied*, 502 U.S. 815, 112 S.Ct. 67, 116 L.Ed.2d 42 (1991); *United States v. Hawkins*, 905 F.2d 1489, 1495 (11th Cir.1990) (limited testimony admissible to rebut defense claim that postal service investigation was baseless), *cert. denied*, 498 U.S. 1038, 111 S.Ct. 707, 112 L.Ed.2d 696 (1991). In such a case, the government need not sit idly by while being maligned.

 The law in this circuit, however, is clear that the "opening the door" principle— also called "curative admissibility"—"gives the trial court discretion to permit a party to introduce otherwise inadmissible evidence on an issue (a) when the opposing party has introduced inadmissible evidence on the same

issue, and (b) when it is needed to rebut a false impression that may have resulted from the opposing party's evidence." *United States v. Rosa,* 11 F.3d 315, 335 (2d Cir. 1993), *cert. denied,* — U.S. —, 114 S.Ct. 1565, 128 L.Ed.2d 211 (1994). In other words, the door must have been opened by the prior use of inadmissible evidence. *See id.* That circumstance does not obtain here, and the government has not argued that it does. Forrester mounted a defense that alleged no government wrongdoing, but was predicated instead on *Forrester's* wrongdoing of a different sort: prostitution. This defense did not require use by Forrester of inadmissible evidence. Had Rodriguez testified, of course, the jury could have drawn its own conclusion as to the character of the assignation at the hotel. Colwell's statement was improperly admitted because his state of mind was "irrelevant to the issue being tried: The question of the defendant's guilt." *Reyes,* 18 F.3d at 71.

### 2. Statement That Declarant Had Told Agent Seymour About "Sam"

▮ In addition to Colwell's challenged testimony, Forrester claims that the district court erred in admitting certain testimony of DEA agent Seymour, who had interviewed DeLuco, Bagley, and Golemba. Over objection, Seymour was permitted to testify to statements made to him by declarant Rodriguez that tended to explain certain deficiencies in the written reports in which he summarized his interviews with the three couriers.

Called by the defense to impeach Golemba, Seymour was questioned about the omission of the names of the two alleged ringleaders from his reports. The agent testified that when he interviewed Golemba on March 1, 1989 he "already knew" about the role of "Sam" in the scheme described by the couriers, thus suggesting that references to the ringleaders did not appear in his field reports because the information was not new to him and therefore was not significant for purposes of the report.

When the government cross-examined the agent, it inquired as to his testimony that he already knew about "Sam":

Government: Now, you mentioned on direct examination that you already knew that Sam was involved?

Seymour: Yes.

Government: Sam and Tony?

Seymour: Yes.

Government: And how did you know that?

Defense: Your honor, I'm going to object, just at the side bar, I'm not sure what we're getting into here.

(At the side bar:)

Defense: He's asking him a wide open question which may produce all types of hearsay, so I'd want an offer of proof, how he knows about that.

Opposing the request for an offer of proof, the government argued that the defense had opened the door to the proposed testimony: that Seymour had been told about "Sam" by Rodriguez. The government theorized that the defense's earlier questioning had placed Seymour's state of mind in issue.

Apparently persuaded, the district court overruled the objection and allowed Seymour to testify that he already knew about "Sam" through information received from the Stamford police and the seventeen year old declarant. After offering to give any limiting instruction thought sufficient by the defense, the court further allowed Seymour to repeat specific statements made by Rodriguez to him.

Government: What did she tell you about Sam?

 * * * * * *

Seymour: Sam was going to—had provided the tickets. Sam gave them directions. And Sam and his friends were going to give her the cocaine that she was going to take over to England on a trip with Jay DeLuco. And she didn't want to go. And she proceeded to tell me a lot more details.

The government thus sought to counter the implication that Seymour had omitted "Sam" 's name from his reports because, in fact, the women had not mentioned "Sam" or "Tony" until after they had an opportunity to confer and concoct a story. The government

claims that the defense "opened the door" to the testimony, by questioning the omission of the ringleaders' names from Seymour's report.

 Technically, this evidence was not hearsay. The government offered the evidence not for the truth of the matters asserted—(1) that "Sam" had provided tickets and instructions prefatory to providing cocaine, and (2) that Rodriguez did not want to go to London—but to explain *why* the reports did not support the couriers' testimony that they had told him about "Sam" and "Tony." Seymour's state of mind was relevant to that limited extent. Further, the district court offered to give a limiting instruction, an invitation that went unanswered. *Cf. Reyes,* 18 F.3d at 69 (where jury was instructed not to consider out-of-court declarations for their truth, technically no hearsay was received in evidence).

 Nonetheless, we conclude that it was error to admit the testimony. In addition to determining whether there is a relevant permissible purpose for which disputed evidence is offered, courts are instructed to determine "whether the probative value of this evidence for its non-hearsay purpose is outweighed by the danger of unfair prejudice resulting from the impermissible hearsay use of the declarant's statement." *Id.* at 70; *see also* Fed.R.Evid. 403. In order to assess the potential prejudice, it is important to determine whether (1) the declaration addresses an important disputed issue in the trial; (2) the statement was made by a knowledgeable declarant whose testimony is likely to be credited by the jury; (3) the declarant will testify and thus be available for cross-examination; and (4) curative or limiting instructions effectively protect against prejudice or misuse by the jury of the evidence. *See Reyes,* 18 F.3d at 70–71.

In this case, as in *Reyes,* "virtually every variable argues against receipt of this evidence." *Id.* at 71. As a corollary to Forrester's prostitution defense, he postulated that the couriers had implicated him in order to lessen their sentences. Thus the testimony—that Seymour already knew about "Sam" *and* knew, in elaborate detail, his purported role in the smuggling scheme—

went to a disputed issue at trial: whether the couriers had, in fact, told Seymour about the supposed ringleaders before they had an opportunity to invent a story that would benefit them.

Moreover, the out-of-court declarations were made by a knowledgeable speaker. Rodriguez, who was present at the Ramada Inn and thus well-informed about the events that transpired there, made statements that placed Forrester at the Ramada Inn with DeLuco, and that suggested the encounter was narcotics related. Further, as the defense points out, and the government has not contested, Rodriguez had no apparent motive to lie; unlike Bagley, Golemba and DeLuco, the declarant was not charged with a crime. And even if she did have some reason to fabricate a story, she, unlike the three women who testified, had no opportunity to do so. She made her alleged statements to both agents before the others knew that the scheme was unravelling. Moreover, the jury could have inferred from Seymour's testimony, quoted above, that she had been recruited by the conspirators but had declined to participate in their nefarious doings. The jury was likely to have credited Rodriguez's statements, as recited by Seymour. This factor does not favor admission of the testimony. And, it is undisputed that Rodriguez did not testify and thus was not available for cross-examination, another factor that weighs against admission.

 Finally, we conclude that a limiting instruction would not have been an effective shield against the dual risks of misuse and unfair prejudice. As *Reyes* makes plain, the court must determine the likelihood that the jury will take the statements for their truth. *Reyes,* 18 F.3d at 69. In this case, the risk was unacceptably high. Rodriguez's credibility had been untested, and her statements went to a material disputed issue. It was an abuse of discretion to admit Rodriguez's detailed description of "Sam"'s activities.

*B. Agent Seymour's "Opinion Testimony"*

 Forrester also claims that the government posed two improper questions to

Seymour in an effort to rehabilitate Golemba. Golemba had testified on cross-examination that not only had she told Seymour about "Sam"—a detail which does not appear in his report of the interview—but also that she had identified a photograph of Forrester on that date, a representation which is also not corroborated by the agent's report.

On cross-examination of Seymour, after he had conceded that he had no recollection of Golemba's alleged identification of Forrester and that his written report contained no such reference, the government asked Seymour whether "[Golemba's] testimony [in court] was in any way inconsistent with the statement that she gave [him] on March 1st, 1989?" Over the defendant's objection, the agent was permitted to reply as follows: "No, I hadn't found her testimony to be inconsistent." At that point the defense requested a sidebar and specifically objected to the "inconsistencies" testimony.

The government justified Seymour's testimony with respect to Golemba's consistency on the ground that, because Seymour was the only other person present for both the interview and the trial testimony, his comparison of the two would be "helpful" to the jury. The court denied the defense's application to strike the testimony and instructed the jury as follows: "In light of the testimony of Agent Seymour regarding the testimony of another witness here today, I want to remind the members of the jury, and I instruct the members of the jury, that it is the function of the jury to determine the credibility of each witness."

■ Because no objection specific to the question about Golemba "making up facts" was lodged, it can be argued that the claim was waived. The government has not advanced this contention, however, and we hold that the defense's timely objection to the "inconsistency" question, especially in light of the court's instruction—which did not distinguish between the two objectionable questions—sufficiently preserved the claim for our review.

We reject the argument apparently accepted by the district court: that the testimony was permissible opinion evidence intended to help the jury. As an initial matter, it is unclear from the trial transcript whether the government sought to invoke Federal Rule of Evidence 702, dealing with expert opinion testimony, or Rule 701, addressing the opinions of lay persons. The government submits on appeal that the testimony was proper as a lay opinion. In any event, no foundation was laid for Seymour's testimony as an expert on credibility. Accordingly, we analyze the question under Federal Rule of Evidence 701 which provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

Fed.R.Evid. 701.

■ As a matter of law, "[t]he credibility of witnesses is exclusively for the determination by the jury, and witnesses may not opine as to the credibility of the testimony of other witnesses at the trial." *United States v. Scop*, 846 F.2d 135, 142 (2d Cir.) (citation omitted), *rev'd in part on reh'g on other grounds*, 856 F.2d 5 (1988). The government's argument that Seymour was making an objective observation, rather than in effect sanctioning Golemba's testimony, is unpersuasive. Far from being "helpful," Seymour's testimony invaded the traditional province of the jury. *See, e.g., Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 628, 64 S.Ct. 724, 729, 88 L.Ed. 967 (1944); *United States v. Weiss*, 930 F.2d 185, 195 (2d Cir.), *cert. denied*, 502 U.S. 842, 112 S.Ct. 133, 116 L.Ed.2d 100 (1991); *United States v. Richter*, 826 F.2d 206, 208 (2d Cir.1987) ("Determinations of credibility are for the jury, not for witnesses."). We are troubled by the fact that the government seems to have been making a determined effort to cloak a witness, whose credibility was at best irresolute, with the "heightened credibility" that government agents are afforded by some jurors. *See United States v. Scanio*, 900 F.2d 485, 493 (2d Cir.1990). *Cf. United States v. Ziegler*, 583 F.2d 77, 81 (2d Cir.1978) (allowing government agent to repeat prior consistent

statements of dubious government witness was improper effort to obtain illegitimate corroboration). The government improperly solicited a lay opinion from an official witness as to the credibility of another witness. Admitting such testimony was error.

### C. Bagley's Prior Consistent Statement

 Over objection, the court permitted the government to mark for identification a seven-page handwritten document that Bagley said contained the details of her interview statements to Seymour. Bagley testified that she had drafted the document on her mother's advice and had given it to Seymour three weeks after the March 1st interview. The document was apparently drafted sometime during that three week period. The government's proffer suggested two rationales for its reliance on the document, which was not actually admitted into evidence. In response to the defense's objection that the statement constituted an impermissible prior consistent statement made after a motive to fabricate arose, the government suggested that the statement would refresh Bagley's recollection as to what she told Seymour in a conversation they evidently had three weeks after the initial interview. Revealingly, however, the government added, "It's done to rebut the cross-examination that she was making up this story."

 Prior consistent statements of a witness may be admitted if offered to rebut an implication of recent fabrication or improper motive. See Fed.R.Evid. 801(d)(1)(B). The statement must have been made before the declarant developed the alleged motive to fabricate. See Tome v. United States, —— U.S. ——, ——, 115 S.Ct. 696, 700, 130 L.Ed.2d 574 (1995); Applebaum v. American Export Isbrandtsen Lines, 472 F.2d 56, 62 (2d Cir.1972). Forrester argues that Bagley's motive to fabricate arose as soon as she was arrested and that, therefore, her statement was inadmissible hearsay. We agree.

 We first reject the government's argument that the document was merely used to refresh Bagley's recollection. It is clear from the trial record that the government's main purpose was to bolster the credibility of a discredited witness whose motive to shade the truth existed before she drafted the contested statement. As Tome made clear, such a use is impermissible. See Tome, —— U.S. at ——, 115 S.Ct. at 701 ("Prior consistent statements may not be admitted to counter all forms of impeachment or to bolster the witness merely because she has been discredited."). We believe that the Tome rationale applies to a document marked for identification where the government has admitted that its purpose in using the statements contained in the document was "to rebut the [inference] that [the witness] was making up this story."

 A prior consistent statement cannot refute a charge of prior fabrication unless it "was made before the source of the bias, interest, influence or capacity originated." Tome, —— U.S. at ——, 115 S.Ct. at 700 (quoting E. Cleary, McCormick on Evidence § 49, p. 105 (2d ed.1972)). A statement made after an improper motive exists is not within the scope of Federal Rule of Evidence 801(d)(1)(B). Id. Despite Bagley's childlike demeanor, of which the district court took judicial notice, her motive to fabricate clearly existed before the statement was made. See Tome, —— U.S. at ——, 115 S.Ct. at 705 (applying Rule 801(d)(1)(B)'s temporal requirement to a four year old declarant). Although Tome had not been decided at the time of trial, it clearly would bar use of the statement on re-trial to rebut the inference that Bagley was "making things up."

### D. Declarations Were Not Harmless Error

 The government claims that any evidentiary error committed by the district court was harmless. In our view, the erroneously-admitted Rodriguez declarations are sufficient to require a new trial.

 Error is harmless if it is "highly probable" that it did not contribute to the verdict. See United States v. Tussa, 816 F.2d 58, 67 (2d Cir.1987). See also United States v. Corey, 566 F.2d 429, 432 (2d Cir. 1977); United States v. Castro, 813 F.2d 571, 577 (2d Cir.), cert. denied, 484 U.S. 844, 108 S.Ct. 137, 98 L.Ed.2d 94 (1987). Error going "to the heart" of a critical issue is less likely

to be harmless. *Cf. Tussa,* 816 F.2d at 67 (evidence going to the heart of an issue was extremely prejudicial). Moreover, "[e]ven if an appellate court is without doubt that a defendant is guilty, there must be a reversal if the error is sufficiently serious." *Id.*

■ We reject the government's claim that any error flowing from the testimony of either agent was harmless. As we explained in *Reyes,* "the mere identification of a relevant non-hearsay use of such evidence is insufficient to justify its admission if the jury is likely to consider the statement for the truth of what was stated with significant resultant prejudice." *Reyes,* 18 F.3d at 70. Rodriguez's statements—those related by both Colwell and Seymour—went to the critical issue at trial: whether Forrester was, in fact, involved in the cocaine smuggling ring. *See id.* at 71. There can be little question but that the substance of Rodriguez's statements was unfairly prejudicial. Her declarations conveyed that (1) the incident at the Ramada Inn was narcotics-related—a statement which, if accepted for its truth, is extremely damaging; and (2) Forrester, whom all of the women had identified as "Sam," was the ringleader of a narcotics importation scheme whose many details he controlled. Rodriguez's declarations, taken for their truth, imparted "a powerful message that the defendant was guilty," *id.* at 71, and we cannot say that it was "highly probable" that they did not contribute to the verdict. *See Tussa,* 816 F.2d at 67. The errors with respect to Seymour's "opinion" testimony and the prior consistent statement only exacerbated the undue prejudice created by the Rodriguez declarations.

### Conclusion

For these reasons, the judgment of conviction is reversed and the case is remanded for a new trial. We do not reach the sentencing quantity issue raised by Forrester.